WRIGHT, COMPTROLLER GENERAL OF THE STATE
OF GEORGIA, *v.* GEORGIA RAILROAD AND BANK-
ING COMPANY.

APPEAL FROM THE CIRCUIT COURT OF THE UNITED STATES FOR
THE NORTHERN DISTRICT OF GEORGIA.

No. 70. Argued January 11, 1910.—Decided February 21, 1910.

A special charter to a railroad corporation contained a provision of
exemption from taxation as follows: "The stock of the said com-
pany and its branches shall be exempt from taxation for and during
the term of seven years from and after the completion of the said
railroads, or any of them; and after that, shall be subject to a tax not
exceeding one-half of one per cent, per annum, on the net proceeds
of their investments," in construing this provision held that:

The words "after that" are equivalent to the word "thereafter" and
relate to the entire period of time after the expiration of the seven
years of total exemption, and are not to be construed as limited by
another provision in the charter for a definite period during which
the corporation should have exclusive rights.

The capital stock of a corporation is the capital upon which the busi-
ness is to be undertaken and is represented by property of every
kind acquired by the company, while the shares are mere certifi-
cates representing a subscriber's contribution to the capital stock
and measuring his interest in the company. This distinction is ob-
vious, although the words "stock" and "shares" are sometimes
used synonymously.

The stock exempted in this case was the capital or property of the
corporation and not the shares of stock in the hands of the stock-
holders.

The Federal courts accord to a judgment of the state court only that
effect given to it by the courts of the State in which it was rendered;
and where the highest court of a State has held that a judgment in

a tax suit is not *res judicata* in a suit for taxes subsequently assessed for another year, even though it must be decided on the same questions, this court will regard such a decision only as an authority and determine the question on its merits.

Where the capital of a corporation is exempted from taxation, except as specified, the exemption continues even if the property appreciates in value; and where, as in this case it is evident that the legislature intended that the taxation of the corporation should be measured by the income, the exemption will not be construed as limited to the then value of the property so that natural increases in value will be subject to any other method of taxation than that stipulated in the charter.

A law which imposes a tax upon the franchise of a railroad company whose property is exempt from taxation is a law in derogation of the exemption contract.

An act of a state legislature attempting to tax the whole or any part of the capital or franchise of a corporation, whose charter contains an express limitation and method of taxation such as in this case, by any method other than that specified therein, impairs the obligation of the charter and is unconstitutional under the contract clause of the Federal Constitution.

A state statute authorizing or directing the grant or transfer of the privileges of a corporation which enjoys immunity from taxation or regulation should not be interpreted as including that immunity in the grant or transfer. *Rochester Railway Co.* v. *Rochester*, 205 U. S. 236, 252.

While an exemption from taxation enjoyed by a corporation which acquires the franchises and property of another corporation may not be affected as to property which it already possesses, such exemption does not apply to additional property so acquired, nor do the exemptions enjoyed by the corporation whose property and franchise are acquired pass to the purchasing corporation.

The power of taxation is never to be regarded as surrendered or bargained away if there is room for rational doubt as to the purpose.

Where the decree is affirmed but modified as to a substantial contention the costs of the appeal will be divided.

THE facts are stated in the opinion.

Mr. *Samuel H. Sibley* and Mr. *John C. Hart*, with whom Mr. *Hooper Alexander* was on the brief, for appellant.

Mr. *Joseph B. Cumming* and Mr. *Joseph R. Lamar*, with

whom *Mr. Alexander C. King; Mr. Boykin Wright* and *Mr. Ligon Johnson*, were on the brief, for appellee.

Mr. Justice Lurton delivered the opinion of the court.

This is a bill to restrain the enforcement of certain taxes imposed by the State of Georgia, which the railroad company claims to be in violation of a contract between itself and the State. The court below sustained the contention of the railroad company, and held that the scheme of taxation found in the charter of the company was of inviolable obligation and enjoined any method of taxation conflicting with the stipulations of the charter; from this decree the comptroller has appealed.

The charter in question was granted by the State of Georgia in 1833, a time long before the imposition of any restriction upon the power of the legislature of that State to stipulate for either an entire or partial exemption from taxation. It is, therefore, not denied by the State that the charter constitutes a contract which may not be impaired by subsequent legislation. In view of this concession we are only called upon to decide the extent of the charter exemption, and, incidentally, its duration.

The controlling section of the charter is the fifteenth. The part now relevant is as follows:

"The stock of the said company and its branches shall be exempt from taxation for and during the term of seven years from and after the completion of the said railroads, or any of them; and after that, shall be subject to a tax not exceeding one-half of one per cent, per annum, on the net proceeds of their investments."

The period of absolute exemption has, of course, long since passed. The only question is as to the duration and extent of the partial exemption which followed.

That the property exempt altogether for seven years is the same property subject to a limited tax thereafter was long

ago decided by the Supreme Court of Georgia in a case which involved the interpretation of this very contract. *City Council of Augusta* v. *Georgia Railroad & Banking Company*, 26. Georgia, 651, 661 *et seq.* The question in that case was as to the legality of municipal taxes assessed by the city of Augusta upon that part of the capital of the company employed in its banking- business and upon real estate situated in that city. The taxes were held illegal. Interpreting this section, that court said:

"It means, first, that the stock of the company, was to be subject to a tax, but not to any tax exceeding one-half of one per cent on the net proceeds of its investments." Second, "That the stock of the company, as stock, as a unit, is alone what is to be subject to the tax; not parts of the stock as the part used in banking, nor the particulars in which the stock consists; as, the land, cars, rails, etc." Third, "That this tax to which the stock is to be subject, is to be a tax to be laid by the State."

We may as well turn to one side just here to deal first with the question of the duration of this commuted tax which is to follow the period of tax exemption, because we construe the words "after that," which immediately follow the exemption clause, as synonymous with "thereafter," and as fixing the time when that property which was theretofore exempt should be subject to the system of taxation provided by the succeeding clause.

It has been rather faintly urged that the duration of this commuted tax or partial exemption was limited to a term of thirty-six years after the completion of the railroad, and that this period has long since expired. This suggested limitation seems to have no other basis than that the words "and after that" do not mean "thereafter," as we have assumed, nor refer to the limitation immediately preceding, but to a more remote limitation found in the second section of the charter, and again in the earlier part of the fifteenth section. But the thirty-six year limitation is one obviously applicable

only to the grant of an exclusive right, within a defined territory, to construct and operate railroads.   This was intended to protect this pioneer railroad from being paralleled within that time.   The recurrence to this exclusive right in the first part of the fifteenth section is only for the purpose of placing a condition thereon which, as matter of fact, never happened, and which, therefore, never became vested, and to provide that the termination of that right should not otherwise affect the corporate existence, estate, powers or privileges of the company.   This reference to the exclusive right conferred first by the second section is followed by the provision above set out, providing that "the stock of the said company and its branches shall be exempt from taxation for and during seven years from and after the completion of said railroads, or any of them, and after that shall be subject to a tax not exceeding one-half of one per cent per annum on the net proceeds of their investment."   "After that" obviously refers to the last limitation, the termination of the exemption period, and it would be an indefensible construction to construe the words as referring it to the thirty-six year limitation of the exclusive right regulated by the preceding part of the same section.

Coming now to the question as to what is the meaning and scope of the partial exemption found in this clause, we are confronted, first, with the contention that only the shares in the hands of shareholders are within either the first or second clause of this contract, and that the entire property of the company is subject to the taxing power of the State, unaffected by any contract for any stipulated form of limited taxation.   This claim is, of course, bottomed on the contention that "stock of the said company and its branches" refers to and means only the shares in the capital stock held by the shareholders, and that the benefit of the stipulation was intended for the shareholders in their character as such.

The word "stock" is not uniformly used to designate the capital of a corporation although its primary meaning is capital, in whatever form it may be invested.   Indeed, it is

not at all unusual to find the word used synonymously with
"shares," and meaning the certificates issued to subscribers
to the company's stock. It is therefore important to look at
the connection in which the word is used when an exemption
or substituted method of taxation is involved, to see whether
the legislative intent was to exempt the capital of the com-
pany, in whatever form invested, or the shares of stock in
the hands of the shareholders. *Powers* v. *Detroit & Grand
Haven Railway,* 201 U. S. 543, 559. There is an obvious dis-
tinction between the capital stock of an incorporated com-
pany and the "shares" of the company. The one is the
capital upon which the business is to be undertaken, and is
represented by the property of every kind acquired by the
company. Shares are the mere certificates which represent
a subscriber's contribution to the capital stock, and measure
his interest in the company. The charter, plainly enough,
recognized this. Thus, in the third section, it is provided that
"*the stock* of the company . . . . shall consist of fifteen
thousand shares of one hundred dollars per share, and *the
said company to be formed on that capital.*" By a later section
the times and places for taking subscriptions are defined, "so
that on summing up the whole it may appear whether *the
stock* is filled up, *or falls short of the aforesaid capital.*" In the
seventh section we find the interest of the subscribers to the
"stock" recognized and described as shares, while the capital
of the company in which he holds such shares is described as
"the stock of the said company." Thus each subscriber is
given "a number of votes equal to the number of *shares* he
may hold in the *stock* of the company." That "stock," as
used, means "capital" in whatever form invested, appropriate
to the purpose of the company, is also plainly evidenced by
the provision that after the total exemption period this stock
shall be subjected to a specific tax "on the net proceeds of
their investments." It has been suggested that by "their
investments" was meant the investments of the shareholders
in the company's stock. This interpretation is based upon

the use of the plural "their"; but in many places in this same charter the company is referred to in the plural. As this same act provides for the organization of one, or more companies to construct branch lines, and extends to them the same tax exemption, it is grammatically correct to read "their" as referring to this plurality of companies. That "stock" in the first clause means capital, and "their investments," the property into which the company's capital has gone, seems in any view. you take of it the most rational interpretation of the matter. That the only mode of taxation stipulated for after the period of total exemption is a tax upon the net income of the company's property is seemingly the plain and obvious meaning of this contract. That this is the way in which it has been read and interpreted by everybody who has had to do with the matter of taxation in an official way since 1845, when the railroad seems to have been finished, affords strong evidence that this construction accords with the intent of the charter. Aside from at least sixty years of legislative and executive acquiescence in reading this partial exemption as applicable to the capital stock of the company, there has been a series of cases decided by the Supreme Court of Georgia which involved the meaning of this clause. In each case the court has held, either, that the whole of the capital was exempt in whatever form invested, or so much of the investment as corresponded in value to the authorized capital stock. *City of Augusta* v. *Georgia Railroad & Banking Company*, 26 Georgia, 651, 662 *et. seq.; The State of Georgia* v. *Georgia Railroad & Banking Company*, 54 Georgia, 423; *Goldsmith, Comptroller &c.*, v. *Georgia Railroad & Banking Company*, 62 Georgia, 485.

In the case of *State of Georgia* v. *The Georgia Railroad & Banking Company*, cited above, the court held that the act of 1874, which sought to assess an *ad valorem* tax against the property of the railroad company was void, as in violation of the obligation of a contract by which the State was limited to a tax which should not exceed one per cent "on its earn-

ings." *Goldsmith, Comptroller,* v. *The Georgia Railroad &
Banking Company* is relied upon as overruling the earlier case.
But this is a mistake for more than one reason. That case
was dismissed for want of jurisdiction over the subject of the
legality or illegality of the tax resisted. Hence, all that was
said about the taxability of the appellee's property under
this charter exemption was *obiter.* But so far as the question
of the applicability of this partial exemption to the capital
of the company as invested in its railroad is concerned, the
opinion distinctly accepts the former case as a settlement
of the question. . Referring to the former case, Mr. Jus-
tice Bleckley said:

"It seems to have been the purpose of this court to hold
in 54 Georgia, 423, that except as to stock issued under the
amendment of 1868 authorizing the Clayton branch, the limit
put by the charter of the Georgia Railroad and Banking
Company upon the taxing power, extends to all the capital
stock of the corporation as a railroad company, and is irre-
pealable. These questions were fairly involved in that case,
and the adjudication of them there announced ought to be
accepted as final."

That Mr. Justice Bleckley afterward concluded that the
former case had not considered or decided whether any excess
of value of property over the amount of the authorized and
exempt capital would be subject to an *ad valorem* tax is true;
but that does not detract from the recognition of the former
as an authoritative opinion upon the point that the exemp-
tion was of the capital of the company.

.We come now to the question as to whether so much of the
value of the company's railroad and appurtenances as exceeds
in value the amount of the authorized capital stock, under
the charter and amendments prior to 1863, is subject to
taxation as other property of like character, under the law of
the State. This value "it is admitted exceeds by four millions
of dollars the nominal value of the capital stock of said com-
pany," which excess, it is further conceded, has been "the

result of natural increase in the value of said property and by renewals, alterations and betterments of the same, from time to time, by said company."

That this is the true and proper method of taxation admissible under the charter exemption has been urged upon several grounds. First, it is said that this construction was given this very charter in *Goldsmith, Comptroller, v. Georgia Railroad & Banking Company*, heretofore cited, and the appellants plead the judgment in that suit as *res judicata*. Confessedly, if this is a good plea, it must operate not only for the purpose for which it has been interposed, but will be entirely fatal to the claim that the exemption now in question has expired or that it extended only to the shares in the hands of shareholders.

The opinion in that case does so construe the exemption, but, as we have already shown, the case went off wholly upon the question as to whether the trial court had any jurisdiction of the question, and the opinion, after construing the clause here involved, passed on to this matter as to whether the question could be made under the statutory remedy resorted to by the company, and concluded by holding that whether the railroad company had been taxed illegally or not, the court below ought to have dismissed the proceeding for want of jurisdiction, and that the remedy, if any, was by bill in equity. Accordingly the judgment which the Supreme Court entered was one which reversed the judgment below and directed that the proceeding be dismissed for want of jurisdiction. This judgment in no way involved the construction of this exemption contract, nor the liability of the Georgia Railroad Company to taxation upon its property, or otherwise, and does not therefore have any efficacy as an estoppel. There was therefore no error in the ruling of the Circuit Court that this plea was bad. Upon the other hand, when the plea of estoppel just disposed of came in, the complainants amended their bill and set up the judgment in the earlier case of the *State of Georgia* v. *The Georgia Railroad & Banking Company,*

54 Georgia, 423, as an adjudication concluding not only the claim that the exemption was only of the shares in the hands of shareholders, but as an adverse decision of this claim that only so much of the "investments" of the company were exempt from a general *ad valorem* tax as equalled in value the authorized capital stock of the company under the charter and amendments prior to 1863.

But in *Georgia Railroad & Banking Company* v. *Wright,* 124 Georgia, 596, the Supreme Court of Georgia seems to have definitely decided that a judgment in a suit to collect a tax assessed for one year is not a bar to a suit for taxes subsequently assessed for another year, although the question decided in the first case is the same question upon which the second suit must be also decided. .

This court, as is well settled, accords to a judgment of a State only that effect given to it by the court of the State in which it was rendered. *Union Bank* v. *Memphis,* 189 U. S. 71; *Covington* v. *First Nat. Bank,* 198 U. S. 100.

We shall therefore disregard this plea, and determine the matter upon its merits, giving to the decision of the Georgia court consideration only as an authority.

Coming then to the question on its merits: Under the original charter and certain amendments there exists to-day an authorized capital stock of $4,156,000. This leaves out of account a small increase under a later act, aggregating 440 shares, which capital is subject to taxation and is not now in dispute. The railroad property, including its railway, depots, equipments and appurtenances proper, have a present value of some four millions of dollars in excess of the authorized capital. Now the contention is that to the extent of this excess the property of the company is assessable and, taxable as other property. There is not much to be gained by the reference to *Farrington* v. *Tennessee,* 95 U. S. 679, 687, and *Bank of Commerce* v. *Tennessee,* 161 U. S. 134, 137, where something is said in an argumentative way about the taxability of a bank's surplus whose capital was exempt. That

might well be if the bank should choose to enlarge its actual capital in the business by using profits as capital instead of distributing them as profits to the shareholders, where the exemption was of a specific amount of capital. The facts in this case are so different from the case presented of a bank's surplus as to make the illustration of little value, even if it was settled that in all cases a bank's surplus would be taxable although its capital was exempt. We have here nothing which corresponds very closely to a bank's surplus. An investment made nearly seventy-five years since of $4,156,000 has now a value of $4,000,000 in excess of that cost. The property is the same property. The conceded fact is that through renewals, alterations and betterments made from time to time and the natural increase in the value of the road, this appreciation has come about. There has been no suggestion that there has been any hiding away of capital added, by either new stock, or by the use of bonds or other forms of credit, nor that the improvements made from time to time, called "renewals, alterations and betterments" have been other than the necessities of an enlarging business and the improved maintenance naturally demanded. There is no suggestion that there has been any bad faith in covering up taxable assets under cover of assets immune. *Mobile & Ohio Railroad Co.* v. *Tennessee,* 153 U. S. 486, 506.

After all, the precise question is, whether the legislative purpose, as expressed, was that the railroad incorporated should pay no tax except one based upon net profits of operation, or was it the intention that a specific amount of capital only should be so relieved? Undoubtedly, the State did not intend that any other capital than that authorized and invested directly in this specific railroad should be immune. That is plain by the express limitation of the charter. But is there any contingency under which this particular railroad is to be subject to any other taxation than one measured by the amount of its net profits? The contract, though one for a partial exemption from taxation, may nevertheless be read

in the light of the purpose sought to be accomplished and the
public policy entertained at the time. - That is true of this,
as well as other contracts, namely, that the meaning may be
discovered by regard to attendant circumstances.  That the
intent was to exempt a capital aggregating $4,156,000, is
for the purpose of the present question the necessary founda-
tion of the claim now being looked at.  That was at the be-
ginning mere subscribers' promises to pay; next, money in
the treasury of the company.  While money, the charter says,
it may, until needed, be invested "in the public stock of the
United States or of the State of Georgia."  But this capital
was intended to be the only means by which this line of
railroad was to be constructed and equipped.  Thus, the
original capital was fixed at one and a half million dollars,
with power to enlarge same, "so as to make their capital
adequate to the work."  This power of increase does not
seem to have been regarded as clear enough, and when an
authorized extension of the work demanded more capital the
charter was amended so as to increase it to four million
dollars, "to meet excess of cost of road over present capital."
To insure the completion of the authorized road within the
limit of the fixed capital it was provided that the engage-
ments of the company should not exceed the company's
capital, and that the officers and directors who should con-
tract beyond that capital should be jointly and severally
liable to the contractors and to the corporation.  Finally, no
power was given to issue bonds, the usual incident to any
modern railway construction.  From the plain purpose that
this authorized capital should be adequate to the construction
and equipment of a particular railroad, it is plainly inferable
that that railroad should be subject, after a time of com-
plete immunity, only to a tax upon the profit of its operation.
That railroad is the product of the investment of the author-
ized capital, and is, as such, subject only to a tax based upon
its "net proceeds."  This plan of tax upon net earnings is
quite inconsistent with any other form of taxation, and is

absolutely independent of any question as to whether the
property thus taxed only upon its profits should have a less
or greater value than the capital invested.  A tax upon earn-
ings is a tax which at last covers and includes, unless double
taxation is intended, all property necessarily held and used
to make that income, including the enjoyment of its fran-
chises.  It is not to be presumed, in the light of the public
policy of the time, that the State intended that this pioneer
railroad should be subjected to any form of taxation of prop-
erty which produced the taxable income.  *State of Georgia* v.
*Atlantic and Gulf R. R. Co.*, 60 Georgia, 268.

We are, therefore, of opinion that this property is not
subject to any other method of taxation than that of the
special system stipulated for by the contract, and that the
act of the Georgia legislature, in so far as it provides for an
*ad valorem* tax upon any part of this invested capital of the
Georgia Railroad and Banking Company, does impair the
obligation of the contract.

But it is said that the tax, so far as imposed upon the
franchise of this company, is not in derogation of the charter,
and that the decree below should be modified in this particular.

If we are right in construing the tax as one upon net income
as a substitute for a property tax, the franchise may no more
be taxed than any other property appropriate to the operation
of the road.  When the State gave up the right to levy and
collect a property tax and to take in substitution a tax upon
the annual net profit, it gave up the right to tax the franchise
of the company as certainly as it gave up the right to tax its
railroad.  The Georgia act taxing franchises treats the fran-
chise as property and requires that "they shall be returned
and valued in the same way as returns are made by railroads
of their physical property. . . ."  And that "all fran-
chises of value shall be returned for taxation and taxed as
other property."  That a law which imposes a tax upon the
franchise of a railroad company whose property is exempt
from taxation is a law in derogation of the exemption contract

is well settled. *Wilmington Railroad* v. *Reid*, 13 Wall. 264; *Gulf & Ship Island Railroad* v. *Hewes*, 183 U. S. 67, 77.

Included in the total mileage owned and operated by the appellee railroad company is a line eighteen miles long, known as the Washington Branch. The company has all along claimed that this branch road was within the partial exemption clause of its original charter, granted in 1833. So far as appears from this transcript, this claim has not before been challenged, though no distinct issue seems ever to have been made in respect to its exclusion by reason of the legislation under which that branch was acquired. Neither does the answer of the comptroller in this case claim or set out any difference between the tax exemption applicable to the other parts of the appellee's railroad and this Washington branch, and the decree of the court below expressly finds that the original charter exemption includes this Washington branch. But the general denial that any part of the property of the railroad company was exempt from *ad valorem* taxation may well be regarded as covering the parts which make up the whole. To the decree holding the Washington branch exempt the comptroller has moreover assigned error, based upon the legislation under which that branch was constructed. The right of exemption claimed for this branch was, however, distinctly put in issue by the counties of Wilkes and Talliaferro, which, for this purpose, were allowed to intervene, having a direct interest due to the fact that that branch, passing through those counties, would be subject to county taxation if not within the tax exemption clause. These counties have appealed from the decree below and assigned error also.

The first legislative enactment in regard to the construction of the Washington branch road seems to have been in the act of 1833; but nothing was ever done under that. The same may be said in reference to another act passed in 1836. In December, 1847, an act was passed in these words:

"The power heretofore granted to the Georgia Railroad

and Banking Co. to construct a branch of their road to Washington, in the county of Wilkes, be, and the same is, hereby revived and authorized to be exercised by said company, provided that the amount of the increased stock of said company ($200,000) shall not be exempt from taxation as is secured to the present stock by the latter clause of the 15th section of the charter of said company, but shall be subject to such tax as the legislature may hereafter impose."

But this was a section in an act amending the charter, and was never accepted. See 26 Georgia, 651, 654. At the same legislative session, on February 5, 1850, another act was passed in these words:

"That [naming incorporators] be and they are hereby authorized to build, construct and keep a plank or railroad from the town of Washington, in Wilkes county, to some point on the Georgia Railroad and Banking Company's railroad, and for that purpose shall be authorized to create and receive by subscription a capital stock not exceeding $200,000, and shall be authorized to exercise all the powers and privileges conferred by the act of the general assembly passed in the year 1833, to incorporate the Georgia Railroad Company, and shall be under all the liabilities and restrictions therein contained."

So far as we can discover, the only legislative authority for the construction or acquirement of a branch railroad to Washington, accepted or acted under by it, is found in the act of January 21, 1852, entitled "An act to authorize the consolidation of the stocks of the Georgia Railroad and Banking Company and of the Washington Railroad or Plank Road Company, incorporated, February the fifth, eighteen hundred and fifty, and for other purposes." The first section of that act provides:

"That the Georgia Railroad and Banking Company and the Washington Rail or Plank Road Company be authorized and empowered to consolidate their stocks, the said Georgia Railroad and Banking Company issuing stocks in their said

company to the stockholders of the Washington Railroad or Plank Road Company, on terms of equality with the general stockholders in amount equal to the amount held by them respectively in the stock of the Washington Railroad or Plank Road Company, and that the two companies aforesaid, after the consolidation of their stocks, shall be known as one corporate body, under the name and style of the Georgia Railroad and Banking Company, and that said corporate body shall be authorized to exercise all the powers and privileges conferred by existing laws upon the Georgia Railroad and Banking Company, and be under all the liabilities and restrictions imposed on the same."

That this consolidation neither extinguished the Georgia Railroad and Banking Company, nor deprived it of any of its powers, privileges or immunities, is plain. No such result has been claimed. Nor is it claimed that it thereby lost any tax exemption which it then had. The act authorizing the consolidation is substantially like that under which the Central Railroad and Banking Company was consolidated with the Macon Railroad, considered in *Central Railroad Company v. State of Georgia*, 92 U. S. 665, where it was held that the tax exemption which the Central Railroad had enjoyed, continued after consolidation in respect of the property of that company, but that as the Macon company, consolidated with it, had no exemption, its property continued subject to taxation. That the Washington Railroad or Plank Road Company would go out of existence when this merger was accomplished is plain; it was, indeed, absorbed by the Georgia company. The purpose was to vest in the latter all of the rights, powers and privileges of the merged company without diminishing or enlarging them. See what is said by Chief Justice Fuller in commenting upon a similar merger in *W. & W. R. Co. v. Alsbrook*, 146 U. S. 279, 300.

Did the Washington Railroad before consolidation possess any contract tax exemption?

The claim that it did is based upon the provision in the

act under which it was incorporated, providing that it should
"be authorized to exercise all the powers and privileges
conferred by the act of the general assembly passed in the
year 1833 to incorporate the Georgia Railroad Company, and
shall be under all the liabilities and restrictions therein con-
tained."

The question, then, is, whether, under the power "to
*exercise* all the *powers* and *privileges* [italics ours] conferred
by the act incorporating the Georgia Railroad Company, the
immunity from any other tax than, one based upon a given
per cent of annual net profits was granted to that company."
The affirmative of this proposition finds some support in the
cases of *Humphrey* v. *Pegues*, 16 Wall. 244; *Chesapeake &
O. R. Co.* v. *Virginia*, 94 U. S. 718; *South Western R. Co.* v.
*Georgia*, 92 U. S. 665, and *Tennessee* v. *Whitworth*, 117 U. S.
139. In later cases this doctrine of a legislative transfer of a
tax immunity under the term franchise, powers, estates or
privileges was questioned. Thus, in *Chesapeake & O. R. Co.*
v. *Miller*, 114 U. S. 176, a tax immunity was held not to pass
under a mortgage foreclosure sale under the provision of a
statute which authorized the purchaser to become a corpora-
tion and "succeed to all such franchises, rights and privileges"
pertaining to the mortgagor company. In *Picard* v. *East
Tennessee &c. R. Co.*, 130 U. S. 637, 642, it was held that
such an immunity would not pass to a purchasing company
under a decree enforcing a statutory lien, where the sale, as
confirmed, was of the "property and franchises" of the
mortgagor company. In that case it was said:

"It is true there are some cases where the term 'privileges'
has been held to include immunity from taxation, but that
has generally been where other provisions of the act have
given such meaning to it. The later, and, we think, the better
opinion, is that unless other provisions remove all doubt of
the intention of the legislature to include the immunity in the
term 'privileges' it will not be so construed. It can have its
full force by confining it to other grants to the corporation."

In *Wilmington & Weldon Railroad Co.* v. *Alsbrook*, 146 U. S. 279, 297; *K. & W. R. Co.* v. *Missouri*, 152 U. S. 301, and *Phœnix Fire & Marine Insurance Co.* v. *Tennessee*, 161 U. S. 174, the earlier cases were also much shaken so far as they tended to establish that a tax exemption would be trans-, ferred by legislative enactment conferring upon one road the powers or franchises or privileges of another, in the absence of other language or pregnant circumstances, showing a plain intent to confer such exemption.

But whatever doubt upon this subject may have existed as to the effect of the transfer to one company of the powers and privileges of another in conferring a tax exemption possessed by the latter is set at rest by *Rochester R. R. Co.* v. *Rochester*, 205 U. S. 236, 252. Mr. Justice Moody, after reviewing all of the cases referred to above and others, sums the matter up by saying:

"We think it is now the rule, notwithstanding earlier decisions and *dicta* to the contrary, that a statute authorizing or directing the grant or transfer of the 'privileges' of a corporation, which enjoys immunity from taxation or regulation, should not be interpreted as including that immunity."

There is an absence of anything in the history of this branch railroad which points to a purpose to grant any exemption from taxation. Thus, in the act of December 20, 1849, reviving the authority of the Georgia Railroad and Banking Company to construct such a branch, originally authorized by earlier acts, it was expressly provided that the stock to be issued for the purpose "should not be exempt from taxation, as is secured to the present stock by the later clause of the 15th section of the charter of said company," etc. This provision was probably the very reason why the Georgia Railroad and Banking Company did not accept or act under that statute. At the same session of the legislature an independent company was created to construct and operate the same branch road. Presumably with the knowledge of the fact that the Georgia Railroad and Banking Company could

not itself construct this road with immunity from taxation, this act authorizing this new corporation to build the same branch, declared that this company should be "authorized to *exercise* [italics ours] all powers and privileges" conferred by the act originally creating the Georgia Railroad and Banking Company. It is one thing to have authority to "exercise" all the "powers and privileges" of another company, and another thing to enjoy an exemption from taxation. The "*exercise*" of the "powers and privileges" of the company referred to, was reasonably essential to the construction and, operation of the independent railroad. Its immunity from taxation was not. See *Wilmington & Weldon R. R.* v. *Alsbrook*, 146 U. S. 279, 295, and *National Bank* v. *United States*, 101 U. S. 1. The power of taxation is never to be regarded as surrendered or bargained away if there is room for rational doubt as to the purpose.

We conclude, therefore, that the Washington Railroad or Plank Road Company had no exemption from taxation at the time this consolidation occurred. That the consolidating act did not intend to confer any immunity from taxation which did not then exist is plain. The object was to vest in the Georgia company the property and franchises and rights and privileges of the Washington company. When the Georgia company succeeded to its property and franchises, it did so subject to whatever right the State had in the matter of taxation. The case in this aspect is controlled by *Central Railroad Co.* v. *Georgia*, 92 U. S. 665.

The decree of the court below is modified so as to exclude the eighteen miles constituting the Washington Branch Railroad, but in all other respects it is affirmed. The costs of this appeal will be divided between Wright, Comptroller General, and the Georgia Railroad and Banking Company.

*Affirmed.*