## FIRST NAT. BANK OF BOSTON v. COMMISSIONER OF INTERNAL REVENUE.

## COMMISSIONER OF INTERNAL REVENUE v. FIRST NAT. BANK OF BOSTON.

### Nos. 2756, 2763.

Circuit Court of Appeals, First Circuit.

Feb. 18, 1933.

MORTON, Circuit Judge, dissenting in part.

Lawrence E. Green, of Boston, Mass. (Daniel L. Brown, George H. B. Green, Jr., and Hale & Dorr, all of Boston, Mass., on the brief), for First Nat. Bank of Boston.

G. A. Youngquist, Asst. Atty. Gen. (Sewall Key and J. Louis Monarch, Sp. Assts. to Atty. Gen., and C. M. Charest, Gen. Counsel, Bureau of Internal Revenue, and Frank T. Horner, Sp. Atty., Bureau of Internal Revenue, both of Washington, D. C., on the brief), for Commissioner of Internal Revenue.

Before BINGHAM, WILSON, and MORTON, Circuit Judges.

BINGHAM, Circuit Judge.

No. 2756 and No. 2763 are cross-petitions to revise a decision of the Board of Tax Appeals of June 11, 1932. The Commis-

sioner, in determining the value of the net estate of Sir John Joseph Garvan, a nonresident alien, who died July 18, 1927, for the purpose of imposing an estate transfer tax, included in the value of the gross estate (1) shares of stock of a foreign corporation, (2) shares of stock of domestic corporations, and (3) bonds of foreign governments, all of which were physically present in the United States at the time of Mr. Garvan's death, being then and for some time prior thereto in the hands of the First National Bank of Boston, the petitioner in No. 2756, for collection of income therefrom for the account of Mr. Garvan.

The Commissioner also included in the gross estate four individual lots of securities consisting of the same classes of property as those above described. These securities Mr. Garvan had previously, on October 26, 1926, transferred or caused to be transferred to his brothers and sisters. At the time of the transfers, these securities were in the hands of the First National Bank at Boston, Mass., and thereafter, down to the date of Mr. Garvan's death, were held by the National City Bank of New York for the purpose of collecting the income for the account of the transferees.

None of the securities, either those owned by Mr. Garvan at the time of his death or those transferred in October, 1926, was at any time, either before or after said transfers, hypothecated or pledged as security for any debt or obligation, nor were the securities employed in whole or in part in any business carried on in the United States, unless they can be said to have been so employed from the fact that they were held by the banks for the purpose of collecting the income for the account of Mr. Garvan and the transferees and for that purpose only.

It further appears that the foreign corporation in which stock was held owns no property in the United States and that none of the bonds of the foreign governments was secured by property within the United States.

The Commissioner also determined that the value of all the securities above described and included in the decedent's gross estate was $1,413,445.21; there being included therein the four individual shares of the brothers and sisters, each of which was of the value of $169,986.68.

The Board of Tax Appeals held (1) that the value of the shares of stock of the domestic corporations owned by Mr. Garvan at the time of his death in the hands of the First National Bank was properly included in the decedent's gross estate; (2) that the value of the shares of the stock of the domestic corporations transferred as aforesaid were properly included in the decedent's gross estate; and (3) that the value of the shares of stock of the foreign corporation and of the bonds of the foreign governments, those owned or transferred, should not be included in the decedent's gross estate. It is from this decision of the Board of Tax Appeals that the cross-petitions for review are brought.

The tax was assessed against the First National Bank as administrator of the estate of Mr. Garvan. It contends (1) that the Board of Tax Appeals erred in holding that the shares of stock in the domestic corporations, both those owned by Mr. Garvan at the time of his death and those transferred by him prior thereto, should be included in his gross estate in determining the value of his net estate situated within the United States for estate tax purposes; and (2) in holding that the Commissioner by his decision imposing the tax had determined as a fact that the transfers of October 26, 1926, were in contemplation of death and the decision made a prima facie case to that effect.

The Commissioner, on the other hand, contends that the Board of Tax Appeals erred in holding that the bonds of foreign governments and the shares of stock in the foreign corporation, both those owned by Mr. Garvan at the time of his death and those transferred by him prior thereto, should not be included in his gross estate for the purpose of determining the value of his net estate within the United States for estate tax purposes.

The statute relating to the tax year here in question is the Revenue Act of 1926, c. 27 (44 Stat. 9, 69, 70, 72, 26 USCA §§ 1092 (a), 1094 (a, c), 1095 (b–e), and note), which provides:

"Sec. 301. (a) In lieu of the tax imposed by title III of the Revenue Act of 1924, a tax equal to the sum of the following percentages of the value of the net estate (determined as provided in section 303) is hereby imposed upon the transfer of the net estate of every decedent dying after the enactment of this act, whether a resident or nonresident of the United States;

"[Here follow the rates.] * * *

"Sec. 302. The value of the gross estate of the decedent shall be determined by including the value at the time of his death of all property, real or personal, tangible or intangible, wherever situated—

"(a) To the extent of the interest therein of the decedent at the time of his death; * * *

"(c) To the extent of any interest therein of which the decedent has at any time made a transfer, by trust or otherwise, in contemplation of or intended to take effect in possession or enjoyment at or after his death, except in case of a bona fide sale for an adequate and full consideration in money or money's worth. Where within two years prior to his death but after the enactment of this act and without such a consideration the decedent has made a transfer or transfers, by trust or otherwise, of any of his property, or an interest therein, not admitted or shown to have been made in contemplation of or intended to take effect in possession or enjoyment at or after his death, and the value or aggregate value, at the time of such death, of the property or interest so transferred to any one person is in excess of $5,000, then, to the extent of such excess, such transfer or transfers shall be deemed and held to have been made in contemplation of death within the meaning of this title. Any transfer of a material part of his property in the nature of a final disposition or distribution thereof, made by the decedent within two years prior to his death but prior to the enactment of this act, without such consideration, shall, unless shown to the contrary, be deemed to have been made in contemplation of death within the meaning of this title. * * *

"Sec. 303. For the purpose of the tax the value of the net estate shall be determined— * * *

"(b) In the case of a nonresident, by deducting from the value of that part of his gross estate which at the time of his death is situated in the United States—

"[Certain deductions follow.]

"(c) No deduction shall be allowed in the case of a nonresident unless the executor includes in the return required to be filed under section 304 the value at the time of his death of that part of the gross estate of the nonresident not situated in the United States.

"(d) For the purpose of this title, stock in a domestic corporation owned and held by a nonresident decedent shall be deemed property within the United States, and any property of which the decedent has made a transfer, by trust or otherwise, within the meaning of subdivision (c) or (d) of section 302, shall be deemed to be situated in the United States, if so situated either at the time of the transfer, or at the time of the decedent's death.

"(e) The amount receivable as insurance upon the life of a nonresident decedent, and any moneys deposited with any person carrying on the banking business, by or for a nonresident decedent who was not engaged in business in the United States at the time of his death, shall not, for the purpose of this title, be deemed property within the United States."

Treasury Regulations 70, adopted subsequent to the enactment of the Revenue Act of 1926, is the same as Treasury Regulations 68, construing the Revenue Act of 1924, and as previous regulations, in force prior to 1924, construing the Revenue Acts theretofore in force, except such parts of article 50 as are included in brackets, which parts are new. Articles 11 and 50 of Treasury Regulations 70 read as follows:

"Art. 11. *Specific property to be included.* —The value of all real property situated in the United States and owned by the decedent at the date of his death should be included in the gross estate, whether the decedent was a resident or a nonresident, and whether the property came into the possession and control of the executor or administrator or passed directly to heirs or devisees. Where the decedent was a resident, the value of all personal property owned by him should be included, wherever situated. Where the decedent was a nonresident, the value of so much of his personal property as had its situs in the United States at the time of his death should be included, and the value of his entire gross estate, wherever situated, should be disclosed, if deductions are claimed. (See arts. 52 to 54.) As to the situs of the personal property of nonresident decedent, see article 50."

"Art. 50. *Situs of property of nonresident decedents.*—Real estate within the United States, certificates of stock, bonds, [bills, notes and mortgages] physically in the United States at date of death, moneys due on open accounts by domestic debtors, and stock of a corporation or association created or organized in the United States, constitute property having a situs in the United States. As to the meaning of the term 'United States,' see article 5. On the other hand, insurance upon the life of a nonresident, and moneys deposited by or for a nonresident not engaged in business in the United States at the time of his death with any person (for meaning of the term 'person,' see section 2 (a) (1)

of the statute) carrying on the banking business in the United States, are not to be regarded as property situated therein.

"[Property of which the decedent has made a transfer (1) in contemplation of or intended to take effect in possession or enjoyment at or after death, or (2) the enjoyment of which was subject, at the date of his death, to any change through a power, exercisable either by the decedent alone or in conjunction with any person, to alter, amend, or revoke, or where such power was relinquished in contemplation of death, is deemed to be situated in the United States if so situated either at the time of the transfer, or at the time of the decedent's death. (See arts. 15 to 20, inclusive)]."

The first question raised by the assignments of error is whether Congress, by the language of the provisions above quoted from the Revenue Act of 1926, intended to include and included stocks and bonds of the character here in question owned by a nonresident alien at the time of his death, or transferred by him as a gift in contemplation of death, the physical evidences of which were located within the United States at the time of his death or at the time of the transfer.

There can be no question that Congress so intended with reference to stock in a domestic corporation, the physical evidences of which were within the United States and which was owned and held by a nonresident (alien or citizen) at the time of death, or of which he had made a transfer in anticipation of death, for section 303 (d) in terms so provides, and the decisions of the Supreme Court at that time recognized the power of Congress to impose taxes on property so located. De Ganay v. Lederer, 250 U. S. 376, 381, 382, 39 S. Ct. 524, 63 L. Ed. 1042; Blackstone v. Miller, 188 U. S. 189, 23 S. Ct. 277, 47 L. Ed. 439; Wheeler v. Sohmer, 233 U. S. 434, 34 S. Ct. 607, 58 L. Ed. 1030; Eidman v. Martinez, 184 U. S. 578, 582, 22 S. Ct. 515, 46 L. Ed. 697. The decision in Farmers' Loan & Trust Co. v. Minnesota, 280 U. S. 204, 50 S. Ct. 98, 74 L. Ed. 371, 65 A. L. R. 1000, was not decided until 1930, and can have no bearing upon the intention of Congress as manifested in the Act of 1926.

We are also of the opinion that Congress thereby intended to include in the gross estate of a nonresident decedent (citizen or alien) the stocks of foreign corporations and the bonds of foreign corporations and governments, the physical evidences of which were within the United States at the time of

his death, or that had been transferred by him in anticipation of death, the physical evidences of which were within the United States at the time of the transfer or of death.

Mr. Garvan died after February 26, 1926, the date of the enactment of the Revenue Act of 1926. Section 301 (a) specifically applies to a nonresident, dying after the enactment of the act, and the term "nonresident" used throughout the sections above quoted includes a nonresident alien as well as a nonresident citizen of the United States. And section 302, which must be read in connection with section 301, is dealing with the gross estates of nonresidents as well as residents, and expressly provides that such a decedent's gross estate "shall be determined by including the value at the time of his death of all property, real or personal, *tangible* or *intangible,* wherever situated." The phrase "wherever situated" necessarily applies to property of the character stated, if situated within the United States, and the intangibles, the stocks and bonds now under consideration, were so located at the time of Mr. Garvan's death. And in subdivision (d) of section 303 it is expressly provided that *"any property* of which the decedent has made a transfer, by trust or otherwise, within the meaning of subdivision (c) * * * of section 302 [in anticipation of death], shall be deemed to be situated in the United States, if so situated either at the time of the transfer, or at the time of the decedent's death." The words "any property," employed in subdivision (d) of section 303, undoubtedly mean and were intended to include "all property, real or personal, tangible or intangible," specified in section 302.

It may be said that the specific provision in section 303 (d), that "stock in a domestic corporation owned and held by a nonresident decedent shall be deemed property within the United States," shows an intention on the part of Congress that the broad provisions of section 302 (a) should not include and cover intangibles such as bonds of domestic corporations and municipalities, or stock and bonds in foreign corporations, or bonds of foreign governments or municipalities, the physical evidences of which were in the United States at the time of the decedent's death. But such a contention cannot be sustained. That specific provision shows an intent to cover and include in the gross estate the value of shares of stock in domestic corporations owned by a nonresident decedent, when the physical evidences of such stock, at the time of the de-

cedent's death, are held at his foreign domicile, as well as when they are held and located in the United States at his death. That clause is certainly not a restriction of the provisions of section 302 (a) as to such intangibles as stocks in foreign corporations or bonds of foreign governments, municipalities, and corporations, the certificates for which, though owned abroad, are physically held in this country at the time of the decedent's death.

If the specific provision in (d) is in any sense a restriction on the general provisions of section 302 (a), it can reasonably be construed to be so only as to such intangibles as bonds of domestic corporations or bonds of foreign governments, municipalities, or corporations owned by a nonresident decedent and actually held and possessed by him at his foreign domicile at the time of his death; and it would appear that the Regulations of the Treasury Department so construe the provisions of the law and regard as included within the statute such last-mentioned bonds and stocks only in case they are physically held and located in the United States at the decedent's death.

We are also of the opinion that Congress, in the Act of 1926, by including intangibles in the gross estate of a nonresident decedent, owned or transferred under the circumstances mentioned, acted in the belief that it had the power so to do and for the reasons above stated.

Furthermore, the construction which we have placed upon these provisions of the Act of 1926 relating to the kinds of securities here in question is the same as that placed by the Treasury Department in its Regulations upon the Revenue Acts in force prior to the enactment of the Act of 1926, which prior acts contained like provisions to those now under consideration. It is therefore reasonable to conclude that Congress was aware of the interpretation placed by the Treasury Department upon like provisions of prior acts and by re-enacting them in 1924 and in 1926 intended that they should cover the class of property in question.

 The next question is whether, construing these provisions of law as we have, it was within the power of Congress so to provide. The contention is made that it was not, that it was a violation of the due process clause of the Fifth Amendment.

While we are aware that the Supreme Court in 1930 and since then has held that the Legislature of a state may not impose a tax upon intangibles owned by a nonresident, the physical evidences of which are located within such state, that to do so is a violation of the due process clause of the Fourteenth Amendment, and that the reason advanced for this holding is that to allow, for purposes of taxation, the situs of intangibles to be held to exist in states other than the domicile of the owner, leads to and has resulted in practical confiscation of that class of property, and that by fixing the situs at the domicile of the owner they are put on a parity with tangibles (taxable at situs), so that each class can be taxed at only one place. Farmers' Loan & Trust Co. v. Minnesota, 280 U. S. 204, 50 S. Ct. 98, 74 L. Ed. 371, 65 A. L. R. 1000 (1930); Baldwin v. Missouri, 281 U. S. 586, 50 S. Ct. 436, 74 L. Ed. 1056, 72 A. L. R. 1303 (1930); First National Bank v. State of Maine, 284 U. S. 312, 52 S. Ct. 174, 76 L. Ed. 313 (1932).

We do not think these decisions determinative of the question now before us, or that the Supreme Court has ever held that the taxing power of Congress is thus limited by the due process clause of the Fifth Amendment. On the contrary, it has specifically held that the taxing power of the federal government is not restrained by the Fifth Amendment to the same extent that the taxing power of the states is by the Fourteenth Amendment. In United States v. Bennett, 232 U. S. 299, 305, 306, 34 S. Ct. 433, 436, 58 L. Ed. 612, the court said:

"But the misapprehension consists not in a misconception as to what the cases relied on decided, but in taking for granted that because the doctrine stated has been applied and enforced in many decisions with respect to the taxing power of the states, that the same principle is applicable to and controlling as to the United States in the exercise of its powers. * * * The application to the states of the rule of due process relied upon comes from the fact that their spheres of activity are enforced and protected by the Constitution, and therefore it is impossible for one state to reach out and tax property in another without violating the Constitution, for where the power of the one ends the authority of the other begins. But this has no application to the government of the United States so far as its admitted *taxing power* is concerned. *It* is coextensive with the limits of the United States; *it* knows no restriction except where one is expressed in or arises from the Constitution, and therefore *embraces* all the attributes which appertain to *sovereignty* in the fullest sense. Indeed, the existence of such a wide

power is the essential resultant of the limitation restricting the states within their allotted spheres, for if it were not so, then government in the plenary and usual acceptation of that word would have no existence. Because the limitations of the Constitution are barriers *bordering the states* and preventing them from transcending the limits of their authority, and thus destroying the rights of other states, and at the same time saving their rights from destruction by the other states, in other words, of maintaining and preserving the rights of all the states, *affords no ground for constructing an imaginary constitutional barrier around the exterior confines of the United States* for the purpose of shutting that government off from the exertion of powers which inherently belong to it by virtue of its sovereignty."

These remarks were made by the court in determining the liability of a citizen of the United States resident therein, for a tax on a yacht which he owned and which was used during the taxing period wholly outside the limits and territorial jurisdiction of the United States, and the question was whether the statute imposing a tax for such ownership and use contravened the due process clause of the Fifth Amendment; and it was held that it did not.

Another case upholding the power of Congress in the imposition of a tax is Cook v. Tait, 265 U. S. 47, 44 S. Ct. 444, 445, 68 L. Ed. 895. There the Supreme Court sustained an act of Congress imposing an income tax upon a native-born citizen of the United States who was permanently residing in Mexico at the time the income was received. The income arose out of real and personal property located in Mexico. The only possible ground for the imposition of the tax was the fact the person subjected to its payment was a native citizen of the United States, for he had no property here and was himself permanently domiciled and residing in Mexico. The tax was upheld, notwithstanding the situs of the property was in Mexico, on the ground that the citizen, though domiciled abroad, and his property, though located without the limits of the United States, derived benefit and protection from the United States; that "the consequence of the relations is that the native citizen who is taxed may have domicile, and the property from which his income is derived may have situs, in a foreign country and the tax be legal— the government having power to impose the tax."

If Congress has power to tax a person permanently residing and domiciled in a foreign country, on income wholly derived from property there located, solely because that person is a citizen of the United States, and the exercise of such power does not contravene the due process clause of the Fifth Amendment, it is difficult to see how the exercise of that power over property physically within the limits of the United States can be said to contravene that provision. It is certain that, in that case, the court did not regard the power there exercised by Congress as contravening the Fifth Amendment simply because the property and its income upon which the tax was imposed might also be subjected to a tax in Mexico; it being there located.

■ It may be said that the certificates of stock and bonds are not property capable of acquiring a situs apart from that of the domicile of the owner. But such certificates are generally recognized as property, and their delivery and acceptance with intent to make a completed gift passes an enforceable title. De Ganay v. Lederer, 250 U. S. 376, 39 S. Ct. 524, 63 L. Ed. 1042; Blackstone v. Miller, 188 U. S. 189, 23 S. Ct. 277, 47 L. Ed. 439; Bank of Commerce v. Tennessee, 161 U. S. 134, 146, 16 S. Ct. 456, 40 L. Ed. 645; Dewing v. Perdicaries, 96 U. S. 193, 24 L. Ed. 654; Wright v. Georgia, R. & Banking Co., 216 U. S. 420, 425, 30 S. Ct. 242, 54 L. Ed. 544; Wheeler v. Sohmer, 233 U. S. 434, 34 S. Ct. 607, 58 L. Ed. 1030; Bond v. Bean, 72 N. H. 444, 57 A. 340, 101 Am. St. Rep. 686; Blazo v. Cochrane, 71 N. H. 585, 586, 53 A. 1026; Bean v. Bean, 71 N. H. 538, 539, 53 A. 907. The recognition by Congress in its Revenue Acts of such certificates as property cannot reasonably be said to transcend its power; and, if title to them may be passed by delivery under circumstances indicating an intent to make a gift or to fulfill a contract of sale, the ascribing to them a situs, where they in fact are, must be equally within the power of Congress.

■ The maxim mobilia sequuntur personam is not an inflexible rule of law, but a legal fiction adopted for convenience and to prevent injustice. Safe Deposit & Trust Co. v. Com. of Virginia, 280 U. S. 83, 92, 50 S. Ct. 59, 74 L. Ed. 180, 67 A. L. R. 386. That was the application made of it in Farmers' Loan & Trust Co. v. Minnesota, 280 U. S. 204, 50 S. Ct. 98, 74 L. Ed. 371, 65 A. L. R. 1000, to avoid double taxation by the states and secure parity between tangibles and intangibles, and also in First National

Bank v. Maine, 284 U. S. 312, 326, 327, 52 S. Ct. 174, 177, 76 L. Ed. 313. In the latter case it was clearly pointed out that, under an inheritance tax statute of a state, *tangible* personal property must be regarded as passing subject to tax only under the laws of the state where it is located; that *intangible* property must be regarded for a like purpose as located and passing under the laws of the domicile of the deceased owner; and that "the contrary conclusion as to *intangible* property has led to nothing but confusion and injustice by bringing about the anomalous and grossly unfair result that one kind of personal property cannot, for the purpose of imposing a transfer tax, be within the jurisdiction of more than one state at the same time, while another kind, quite as much within the protecting reach of the Fourteenth Amendment, may be, at the same moment, within the taxable jurisdiction of as many as four states, and by each subjected to a tax upon its transfer by death, an event which takes place, and in the nature of things can take place, in one of the states only."

Moreover, we cannot say that Congress in the exercise of the sovereign power of the nation may not alter the rule fixing the situs of intangibles at the domicile of the owner and provide that, under circumstances not involving a conflict between states in the taxation of transfers of such property at death, its situs shall be where the bonds and stocks are in fact situated, and that to do so would be such an arbitrary and capricious exercise of power that it would violate the due process clause of the Fifth Amendment. That is in effect what Congress has done in the Revenue Act of 1926, and we think it was acting within its power. It is the arbitrary and capricious exercise of power by Congress that the Fifth Amendment provides against. Heiner v. Donnan, 285 U. S. 312, 326, 52 S. Ct. 358, 76 L. Ed. 772.

The fact that the certificates of stock and bonds, upon Mr. Garvan's death, may have been subjected to a transfer tax by the nation of his domicile, is unimportant. That would not render a federal tax upon his intangible property here located arbitrary and capricious or stand differently than the imposition of a like tax upon his tangible property situated in the United States, and no one would contend that a tax upon the latter would be arbitrary and capricious or in violation of the Constitution. And the supposition that the nation of the domicile may, at his death, have taxed the transmission of the stocks and bonds, does not concern us any more than it did the Supreme Court in Cook v. Tait, supra. There the imposition of a federal tax by the United States upon the income of property located in Mexico was not regarded as a violation of the Fifth Amendment, though the property and income was also liable to be taxed in Mexico. If the federal tax in that case was not in violation of the Fifth Amendment, the one here is not; the property being located here and afforded protection by the laws of this nation.

Then again, unless Congress, in the exercise of its taxing power is more limited and restricted by the due process clause of the Fifth Amendment than it was in 1919, when De Ganay v. Lederer, 250 U. S. 376, 39 S. Ct. 524, 525, 63 L. Ed. 1042, was decided, Congress did not exceed its power in enacting the provisions of the act in question. In that case the plaintiff brought suit to recover a tax paid under protest that had been assessed upon her income for the year 1913, under the provisions of the Act of Congress of October 3, 1913, c. 16, § 2 A, subd. 1 (38 Stat. 166), which provides:

"That there shall be levied, assessed, collected and paid annually upon the entire net income arising or accruing from all sources in the preceding calendar year to *every citizen* of the United States, whether *residing at home or abroad*, and to *every person* residing in the United States, *though not a citizen thereof*, a tax of 1 per centum per annum upon such income, except as hereinafter provided; and a like tax shall be assessed, levied, collected, and paid annually upon the entire net income from *all property* owned and of every business, trade, or profession carried on *in the United States by persons residing elsewhere.*"

The facts were that the plaintiff, Emily R. De Ganay, was a citizen and resident of France; that her father died in 1885 domiciled in Pennsylvania and by his will bequeathed to her outright a large amount of personal property consisting of stocks and bonds of corporations organized under the laws of the United States and bonds and mortgages secured upon property in Pennsylvania; that since 1885, a Pennsylvania company had acted as her agent under a power of attorney and had invested and reinvested her property and collected and remitted to her its net income; that the certificates of stock and bonds and mortgages had been and in 1913, the tax year, were in the possession of the company at Philadelphia; that

the power of attorney authorized her agent to sell, assign, and transfer the stock, bonds, loans, or other securities which she owned, to discharge on the records any mortgages in her name, to sell and assign the same, and to invest and reinvest the proceeds in its discretion, to collect and receipt for all interest and dividends, to indorse checks, to make agreements deemed necessary to represent her and vote at stockholders' meetings, and to do all lawful acts requisite to effect the premises. The question considered was whether the income of the securities above named, owned by the nonresident alien in United States corporations, which certificates of stock, bonds, and mortgages were in the physical possession of the American agent, and the income from which was to be collected and remitted by the agent to such nonresident, was income subject to a tax under the Act of 1913.

It was held (1) that the certificates of stock, bonds, and mortgages were property, not mere evidences of ownership, within the "congressional intent in using the term 'property' in this statute"; that the certificates of stock, bonds, and mortgages were regarded as property according "to the general understanding and within the common meaning usually attached to such descriptive terms," and "by state and federal statutes they are often treated as property, not as mere evidences of the interest which they represent"; (2) that they were property situated in the United States; that the maxim mobilia sequuntur personam was "a fiction at most" and "must yield to the facts and circumstances of cases which require it, and that notes [stocks], bonds and mortgages may acquire a situs at a place other than the domicile of the owner, and be there reached by the taxing authority"; and (3) that as the stocks, bonds and mortgages were "in the Pennsylvania Company's offices in Philadelphia," which, under the power of attorney, was given authority "to sell, assign, or transfer any of them, and to invest and reinvest the proceeds," it was "difficult to conceive how property could be more completely localized in the United States," and that "the power of Congress to tax the income from such securities" cannot be questioned.

In view of this decision we are not prepared to say that the stocks and bonds here in question are not subject to the tax imposed upon them. On the contrary, we think they are subject to the tax and so decide, and that Congress was authorized to make the imposition.

In what has been said thus far with reference to the stocks and bonds transferred by Mr. Garvan as gifts to his brothers and sisters within two years prior to his death, we have proceeded upon the assumption that these gift transfers were made in contemplation of death. It remains to be considered, however, whether this is so, for, if these particular stocks and bonds were not transferred in contemplation of death, there was a completed gift inter vivos, and they were not subject to the tax, as they would not be covered by the act in question.

As to this the First National Bank contends that, as it does not appear that the Commissioner found as a fact that the transfers were made in contemplation of death, the Board of Tax Appeals were not warranted in treating the decision of the Commissioner imposing the tax as embodying such a finding, in the absence of proof that he in fact so found; that, without proof that the transfers were so made, the Commissioner at that time was warranted, under clause 2 of section 302 (c), 26 USCA § 1094 (c), cl. 2, in treating them as made in contemplation of death, for they were gift transfers made within two years of Mr. Garvan's death and after February 26, 1926, the date of the enactment of the Revenue Act of 1926, and because gift transfers thus made were then, according to the second clause of section 302 (c), conclusively presumed "to have been made in contemplation of or intended to take effect in possession or enjoyment at or after his death"; and that, it not appearing that the Commissioner found as a fact that the transfers were in contemplation of death rather than that he considered them as such by reason of the conclusive presumption of the statute, the Board of Tax Appeals erred as a matter of law in holding that the decision of the Commissioner made a prima facie case that the transfers were in contemplation of death.

We are of the opinion that this contention must be upheld. The ruling of the Board of Tax Appeals that the decision of the Commissioner made a prima facie case that the transfers were in fact made in contemplation of death was an error of law, for, as pointed out, the decision of the Commissioner, under the circumstances of this case, contained no such finding and could not be regarded as making a prima facie case, in the absence of convincing proof that the Commissioner in fact so found, which was lacking.

As this fact was not determined by the Board upon adequate proof and as the Su-

preme Court has recently held, in Heiner v. Donnan, 285 U. S. 312, 52 S. Ct. 358, 76 L. Ed. 772 (March 21, 1932), that the conclusive presumption of the statute is unconstitutional and void, the case must go back to the Board of Tax Appeals, where the parties should be accorded opportunity to present evidence and have the fact decided.

And as the Board of Tax Appeals also erred in refusing to include the stocks of the foreign corporation and the bonds of the foreign governments in the gross estate, the order is:

The decision of the Board of Tax Appeals is vacated, and the case is remanded to that Board for further proceedings not inconsistent with this opinion.

MORTON, Circuit Judge (dissenting).

I take it that the statute is only intended to apply to property of nonresident decedents which is situated in this country. Stock in domestic corporations is explicitly covered by the statute. I concur in regarding it as taxable.

As to the foreign bonds and shares, it does not seem to me that they are property situated in this country, within the meaning of the statute. The legal conception of the situs of property of this character has changed from time to time, as is clearly shown in the opinion of the Board of Tax Appeals in Brooks et al. v. Commissioner, 22 B. T. A. 71. It does not seem to me that it was the intention of the statute to enact into statutory law the views as to situs of personal property which were at that time held by the United States Supreme Court, and have since changed. I think the statute is intended to reach property which has a situs here under the law as it stands when the occasion to tax arises. I agree with the majority opinion in Brooks v. Commissioner, supra.