**NEV-CAL ELECTRIC SECURITIES CO. v. IMPERIAL IRR. DIST. et al.**

No. 8106.

Circuit Court of Appeals, Ninth Circuit.

Sept. 23, 1936.

As Modified on Denial of Rehearing Nov. 23, 1936.

888

Call & Murphey, of Los Angeles, Cal., Henry W. Coil, of Riverside, Cal., and Hickcox & Trude, of El Centro, Cal., for appellant.

Harry W. Horton and Geo. R. Kirk, both of El Centro, Cal., and A. L. Cowell, of Stockton, Cal., for appellees.

Before WILBUR, GARRECHT, and HANEY, Circuit Judges.

GARRECHT, Circuit Judge.

From an order and decree dismissing the appellant's amended bill of complaint for failure to state a cause of action and denying a preliminary injunction, an appeal has been brought to this court.

The suit was filed by the appellant on its own behalf; as a landowner in the Imperial irrigation district, hereinafter referred to as "the district"; as the owner of a direct, beneficial interest in the funds and property legal title to which is held in trust for the owners of land within the district; and, finally, as a taxpayer or assessment payer, on behalf of the district.

The expressed purpose of the suit is to recover on behalf of the district and the landowners therein $35,000 already alleged to have been expended, and to enjoin the further expenditure of funds of the district, or the incurring of any liabilities or the levying or collection of any special assessments upon the lands of the appellant.

It is also sought to enjoin the taking of any steps for the purpose of constructing, acquiring, or operating any electrical generating transmission, or distribution system or selling electrical energy produced from such electrical system.

A principal and controlling issue is the constitutionality of the act of 1919, as amended, entitled "An act to provide for the development of electrical power by irrigation districts." Deering's General Laws of California 1923, Act 3868, pp. 1503–1504.

The original complaint dealt chiefly with a proposed Diesel engine electrical generating plant at Brawley, Cal., and the distributing lines in connection therewith for the distribution and sale of electricity within the cities of Brawley and Imperial, Cal., and not elsewhere in the district. On March 21, 1935, the appellant, by leave of court, filed an amendment to its bill of complaint, dealing with alleged threatened expenditures and liabilities in excess of $12,000,000 for the acquisition and construction "of electrical generating plants, wires, lines and appurtenances for the generation, distribution and sale of electrical energy not less than two-thirds of which said defendants threaten and intend to, and will, generate for sale and use outside the boundaries of said district," etc.

On March 11, 1935, immediately prior to the time when the first payment would be due on the contract for the Diesel engine generating plant at Brawley, and within a few days after work was commenced on the construction of distribution lines in that city in connection with the engine plant, the appellant obtained a temporary restraining order and an order to show cause why a preliminary injunction should not be issued, restraining and enjoining the appellees from making any expenditures, incurring any liabilities, or taking any other steps looking to the generation, distribution, or sale of light or power.

Affidavits were presented by both sides on the matter of a preliminary injunction. One of the affidavits presented by the appellees was that of M. J. Dowd, chief engineer and general superintendent of the appellee district, who stated, on information and belief, that the appellant "is a holding corporation and that either through identity of stock holdings, or through direct ownership, * * * [it] is the owner of and controls the operation of * * * the Southern Sierras Power Company," which, he alleged, had "an absolute and complete monopoly" in the power business throughout the appellee district and in the Coachella Valley. Dowd also charged likewise on information and belief that the appellant had instituted the present suit on behalf of the Southern Sierras Power Company, "wholly and solely for the purpose of attempting to use this court as an instrumentality to hamper, delay and interfere with the program of the Imperial Irrigation District, * * * and of assisting said Southern Sierras Power Company in maintaining the monopoly," etc.

A. B. West, president of the appellant corporation, submitted an affidavit denying all the foregoing allegations made by Dowd, with the exception of the statement that the Sierras Company has sold all the electric energy used in the appellee district and the Coachella Valley. West, however, denied the existence of a monopoly.

The restraining order continued in full force, except for two modifications, for 10 months, and until the date of the order and decree from which the present appeal is being prosecuted.

On December 21, 1935, the court below, in a memorandum of conclusions, held that the amended bill of complaint failed to state facts sufficient to entitle the appellant to any relief, and that therefore the bill should be dismissed. The same memorandum also announced that the appellant was not entitled to any preliminary injunction.

On January 15, 1936, the court signed findings of facts and conclusions of law on the preliminary injunction, and signed the order and decree from which this appeal has been taken.

Since, as the appellees concede a motion to dismiss admits, subject to an ex-

ception to be discussed later, all the well-pleaded allegations of the bill of complaint, we will set forth somewhat fully the averments of the bill, including a few that were ordered stricken by the court. The appellant, however, states in its brief that it "is not dependent upon any stricken portions in order to show the bill of complaint as amended states a cause of action."

The appellant's amended bill of complaint alleges that the appellee Imperial irrigation district was organized on July 25, 1911, under the provisions of the California Irrigation District Act (Stats. of Cal. 1897, p. 254, as amended, Deering's General Laws of California 1931, Act 3854; Id., 1933, Supp.). The district is wholly within Imperial county, Cal., and embraces an area of more than 600,000 acres, susceptible of irrigation from a common source, namely, the Colorado river, and by the same system of works, consisting of about 3,000 miles of main and lateral ditches fed from the waters of the river.

Situated within the district are the cities of Brawley and Imperial, the former containing not more than 1,280 acres and a population of not more than 11,000, and the latter with an area not exceeding 2,560 acres and a population not exceeding 2,000. The total population of the district is approximately 60,000. There are four other cities in the district—El Centro, Calexico, Calipatria, and Holtville, the total area of which is 4,000 acres and the total population of which is 18,900.

The appellant is the owner of two tracts of land containing 149.7 acres and 80 acres. Both tracts have, since the incorporation of the district, been liable for assessments levied by the district to pay for the costs of developing the irrigation system for the lands within the district, which assessments have been paid. The appellant's lands also remain liable for special assessments made by the district, and for the operations, liabilities, and expenses of the district, as provided by the California Irrigation District Act. The actual and reasonable value of the appellant's lands is $22,900.

In addition, it appears from the bill of complaint that all of the property acquired by the appellee district, including the moneys expended for the purposes complained of, was realized from special assessments on the lands within the district levied for irrigation purposes on the basis of benefits conferred upon the lands within the district; or consists of moneys realized from the sale of bonds issued by the district for such purposes, to be repaid by special assessment upon the lands of the district on the basis of benefits conferred upon the lands; or, finally, consists of the proceeds, avails, rents, issues, or profits of the property so acquired.

It is then averred that all of the acts and threatened acts complained of are claimed by the appellees to be authorized by the act of 1919, supra, the text of which is set out in full in the bill. It is alleged that the statute is void and unconstitutional, and that the appellant will be deprived of its property without due process of law and denied the equal protection of the laws, contrary to the Fourteenth Amendment of the United States Constitution, in the following three particulars:

(a) In that it purports to authorize any irrigation district to engage "in the private commercial business" of "manufacturing, distributing and selling electrical energy in unlimited quantities, and without any limitation as to whom the same may be sold to, or as to the place where the same can be distributed or sold," etc.

(b) In that it purports to authorize the use of funds collected, or to be collected, by special assessment upon all the lands within the district to be used for such purposes outside of the district, and not in accordance with any assessments levied by the district and "irrespective of any benefits to the lands of plaintiff," etc.

(c) "In that to enforce said statute so as to authorize said district, or any of its officers, to do any of the acts hereinafter alleged to have been done," etc., "under the supposed authority of said statute, or to use any of the funds or property of said district, or to assess the lands of the plaintiff for such purposes, will deprive the plaintiff of its property without due process of law," etc.

Then followed a group of averments setting forth the acts done and threatened to be done under the supposed authority of the act of 1919.

For a period of about 2 years "next prior to" March 20, 1933, the city of Brawley had been devising various plans and considering various projects for a municipal Diesel engine electric generating and distributing system, but, due to lack of finances, such projects had, prior to March 20, 1933, failed of accomplishment. On that date the city entered into a contract for the

construction, installation, and delivery to the city of a Diesel engine power plant designed to generate electrical energy for the city, which contract has never been canceled or terminated. The allegations contained in this paragraph were stricken.

Within 6 months prior to April 4, 1934, according to the complaint, the appellees entered into secret negotiations and a conspiracy with the city officials of Brawley, "wrongfully and unlawfully to divert, misuse and misappropriate" the irrigation funds of the district by having the district construct, maintain, and operate a Diesel engine power plant in Brawley for supplying electrical energy to Brawley and Imperial, but not to other persons or property in the district.

On information and belief it is also alleged that electrical energy was planned to be furnished to "lands and parties" outside of the district. The bill then continues: "The said city of Imperial and its inhabitants are now, and for more than twenty years last past have been, also served and furnished by said Southern Sierras Power Company and its predecessors with an adequate supply of electric energy," etc.

Elsewhere in the bill, a similar allegation is made regarding Brawley.

As a result of the alleged secret negotiations and conspiracy, according to the bill, a complete agreement was reached between the district and the city of Brawley, whereby the district was to purchase the Diesel engine generating plant at the expense of all the lands in the district. A secret agreement for such purchase was ratified and approved at a meeting of the board of directors of the district, without debate or discussion, on April 4, 1934, and was kept secret thereafter until a copy was made available by mandate proceedings, according to the appellant's bill.

On April 4, 1934, the board of directors adopted a resolution authorizing the acceptance and execution of the agreement referred to above, which was between the district and the Hooven, Owens, Rentschler Company, of Ohio.

The contract provided for the manufacture, construction, and erection of three Diesel engines and various other electrical generating equipment, at an aggregate cost of $229,466, including principal and interest, of which sum $35,000 was paid by check, on account, from the funds of the district, and of which latter sum "neither the whole nor any part * * * has been repaid to said District." A copy of the contract is set out, with some immaterial omissions, in the bill of complaint.

It is alleged that none of the Diesel engines has been yet delivered, and that the appellees, unless restrained, will pay out the balance of the $229,466 therefor.

It is next alleged that, in order to make use of the engines and other equipment, it will be necessary for the district to purchase great quantities of other equipment, and to construct extensive structures, and that the appellees threaten, etc., to purchase or construct engine foundations, power houses, etc., for distribution and sale by the district of electricity to Brawley, and, upon information and belief, also to Imperial, as well as to various places and parties outside of the boundaries of the district, at an additional cost of more than $300,000; and that the appellees threaten to employ in that business a large number of persons, at a cost of many thousands of dollars, all of which will be paid out of the funds of the district.

It is next averred that the district in the sale and distribution of electricity will be required to compete with the existing public utility, which already fully occupies all the territory and serves all of the people in the area intended to be served by the appellees, and that the district's light and power business, if entered upon as proposed by the appellees, will be "uneconomic, wasteful, unprofitable, and will entail financial loss on said District."

In this connection it is set up that that portion of the electrical industry which is engaged in the generation and distribution of light and power in Brawley and Imperial, and throughout Imperial county and the state, is highly competitive in character and is now, and for more than 15 years last past has been, passing through a cycle of constantly lowering rates, which it is alleged will prevail for many years in the future; and that the district has not secured a market for its power output. The hazards and uncertainty of the district's securing a market for its light and power are also alleged. It is stated that, beginning in 1936, there will be delivered into Southern California, including Imperial county, from the Boulder Canyon Project on the Colorado river, as much again of electrical energy as is now being generated and consumed in Southern California, "and that thereupon and for many years thereafter

there will be an enormous surplus" of such energy for sale in that section of the state, thereby producing more highly competitive conditions and lower prevailing rates; that, by reason of the foregoing and other facts, the district's undertaking will be launched "at the most unpropitious time and under the most unpromising conditions," etc., resulting in great monetary loss, etc., to the district.

It is averred that all of the expenditures of the district in connection with the Brawley project will aggregate more than $600,000; that the capacity of the Diesel engine plant is sufficient to serve only Brawley and Imperial in their "congested urban areas"; and that it is not intended to serve any of the product thereof to other portions of the district. It is further charged that the district, in operating the plant, will be engaged "in a purely private proprietary commercial enterprise for the private purpose and benefit only of such consumers as it may procure within the corporate limits of" Brawley and Imperial.

It is averred that special assessments will be levied upon all the lands within the district, including the lands of the appellant, to pay the costs of constructing and operating the Diesel engine project; that neither the appellant nor its lands, nor other agricultural lands, will receive any benefit therefrom, but that all the amounts so levied and assessed will be solely for the private benefit of the inhabitants of Brawley and Imperial, and of consumers outside of the limits of the district.

The bill alleges that the special assessments will cloud the title of the appellant's lands; that, if such assessments are not paid, the lands will be sold to the district, in accordance with the provisions of the California Irrigation District Act, supra, relating to the enforcing of the collection of special assessments; and that a deed to the appellant's lands will be issued to the district. It is further averred that, in order for the appellant to retain title to its lands, thus assessed, it will be unlawfully forced to pay the assessments or to bring numerous and successive suits to enjoin the collection of said special assessments, etc.

Neither the appellant nor any other landowner within the district, it is alleged, has been given any notice or opportunity to be heard upon the matter of whether or not the appellant's lands or the other lands within the district will be benefited by the construction or operation of the generating plant, etc., or by the sale of electricity thus generated. According to the bill, the question of making any levy of special assessment for any of those purposes has never been submitted to a vote of the electors of the district, nor has any estimate of the amount required for such purposes ever been made by the directors, nor has notice been given or published, calling for bids for the construction of such work, etc.

It is further alleged that the district has no construction fund, or any fund that may properly or legally be used for the construction or acquisition of the above plants, etc., or any moneys arising from the sale of bonds voted for the construction or for the acquisition of property of any kind, or any moneys arising from assessments made for such acquisition or construction; and that the above project is not a part of any construction plan of the district for which bonds or funds were provided.

The bill alleges that the district now has outstanding bonds in the principal sum of not less than $14,250,000; that the principal and interest past due and unpaid upon the bonded indebtedness to July 1, 1934, was not less than $2,360,000 and since October, 1931, the district has issued, and there are now due and outstanding, warrants in an amount of not less than $884,-713.89, all of which have been registered and indorsed by the treasurer of the district, "Funds not available for payment"; that no provision for the payment of the above-mentioned past-due indebtedness aggregating in excess of $3,200,000 has been made; that no funds for its payment are available, etc.

It is likewise charged that no notice has ever been given to the appellant or to any other landowner within the district that the district will engage in such activities or perform any other function than as provided in the California Irrigation District Act, supra. No hearing was ever held and no opportunity was ever afforded to the appellant or any other landowner within the district to object to the inclusion or retention of their respective lands in the district, or in any other district that would have the right to assess such lands for such purposes or for any other purpose than as provided in the Irrigation District Act, according to the bill, which adds that neither the appellant nor any of its lands will be benefited in any manner by the construction or operation of any electric generation plant, etc.

The bill also alleged that, in addition to the expenditures threatened to be made in connection with the Diesel engine plant at Brawley for the service of Brawley and Imperial, the appellees threaten to expend from the district funds more than $12,000,-000 for the acquisition of plants and equipment for electric energy, not less than two-thirds of which will be sold for use outside the boundaries of the district; that the costs thereof will be assessed against the lands in the district, including the appellant's lands; that the said power plants will have a total capacity of not less than 80,000 horsepower; and that the total consumptive demand for electrical energy by all consumers within the district will not exceed 22,500 horsepower per annum, within the time in which the assessments therefor on the appellant's lands will aggregate more than $3,000.

The bill avers that for the redress of the injuries complained of the appellant will have no plain, speedy, adequate, "or any" remedy at law, and that any remedy at law, if it existed, would require a multiplicity of actions," etc.

It is alleged that the assessments complained of would appear regular on their face, being levied under the Irrigation District Act, ostensibly for benefits conferred by irrigation, but actually, in whole or in part, for the cost of electrical generation plants, etc.; that there would be no means of ascertaining what part of such assessments was valid as for irrigation purposes, and what part was invalid for power purposes; that there would be no way to satisfy a judgment at law against the district; that under the Irrigation District Act the district has the power to create from the general funds, special accounts, which may be placed into the hands of "any * * * persons whomsoever," with authority to pay out such funds without any restriction save that of submitting monthly reports of receipts and expenditures; and that neither such funds nor special accounts are required to be kept within the district, as a result of which situation it is extremely difficult to trace the funds used for such purposes, etc.

The bill also sets forth the adoption in 1915 of a statute (Stats.Cal.1915, p. 1), section 4 of which removes, as to irrigation districts having more than 500,000 acres, the limit of 2 per cent. of the assessed valuation that may be levied only for irrigation purposes; and, upon information and

belief, the appellant alleges that the appellees claim such statute, as amended, as authority for the acts complained of.

Then follows an allegation, which was stricken, to the effect that, if the act of 1915, as amended, authorized such acts and threatened acts, it is unconstitutional and void.

It is averred that no notice or demand on the board of directors of the district to commence suit was necessary, for the reason that such notice or demand would have been futile, since the appellees themselves are doing the acts complained of and are individually liable for the moneys illegally expended, and would refuse to cause the district "to sue themselves." Part of the foregoing allegation was stricken. Nevertheless, it is alleged that, on June 14, 1934, the appellant served on the directors a written notice and demand, calling attention to the alleged illegal acts, etc., but that the directors have refused to comply with the notice and demand, etc.

By the prayer of the bill of complaint, an injunction is sought against the doing of any of the threatened acts, and there is also asked the recovery on behalf of the district from the officers, personally, of the $35,000 paid on account of the Diesel engine contract prior to the suit, and such other expenses as are paid out for any of the purposes complained of. It is also prayed that the act of 1919, as amended, be declared unconstitutional; that the act of 1915, if and to the extent that it authorizes the doing of any of the acts complained of, be also declared unconstitutional; and that it be decreed that none of the appellees has any authority to generate, etc., electrical energy, or to construct any works for such purpose.

There are fifty-seven assignments of error, covering sixteen printed pages. Each assignment is relied upon as a specification of error in the appellant's brief. We believe that this number of assignments and specifications is excessive, particularly in view of the fact that there was no testimony taken in open court, and therefore no asserted errors as to its admission or rejection could be included in such assignments or specifications.

The Supreme Court and this court have repeatedly disapproved "the 'practice of filing a large number of assignments.'" See Cossack v. United States (C.C.A.9) 82 F.(2d) 214, 218, and the authorities there cited. The appellant herein closes its brief

by pointing out that, since it "is not protected by any injunction pending this appeal, we respectfully request as early a decision as a proper consideration of the merits of the appeal will permit." Yet the unnecessary multiplicity of the appellant's own assignments has added to the burdens of this court and delayed our determination of the appeal.

■ While the appellant's major attack upon the Diesel engine contract is bottomed upon the asserted unconstitutionality of the Irrigation District Power Act of 1919, the contract is also assailed upon the grounds that it violates provisions of the Public Works Wage Rate Act (Stats.Cal.1931, p. 910, as amended), in that the contract does not contain a minimum wage scale; and that it violates section 653c of the Penal Code of California, and section 653c-1, as added by St.1933, p. 1644, in that it does not contain the provisions fixing an 8-hour day and a 30-hour week maximum required by those sections.

The record shows, however, that all of the work to be done under the contract in question by the Hooven, Owens, Rentschler Company is to be done out of the state of California and in the state of Ohio, "except the mere assembling on the foundations prepared therefor by this defendant [the appellee district] of said equipment." The contract itself provides that the company agrees to retain an engineer in the station for 90 days to instruct the "Purchaser's personnel in the operation of the engines."

That being so, the portion of the construction to be done in California is, in the language of the books, merely "incidental," "relevant and appropriate to the interstate" character of the contract.

In the leading case of York Mfg. Co. v. Colley, 247 U.S. 21, 24, 25, 38 S.Ct. 430, 432, 62 L.Ed. 963, 11 A.L.R. 611, Mr. Chief Justice White used the following language: "As, in the second place, since the ruling in McCulloch v. Maryland, 4 Wheat. 316, 4 L.Ed. 579, there has been no doubt that the interstate commerce power embraced that which is relevant or reasonably appropriate to the power granted, so also from such doctrine there can be no doubt that the right to make an interstate commerce contract includes in its very terms the right to incorporate into such contract provisions which are relevant and appropriate to the contract made. The only possible question open therefore is: Was the particular

provision of the contract for the service of an engineer to assemble and erect the machinery in question at the point of destination and to practically test its efficiency before complete delivery relevant and appropriate to the interstate sale of the machinery? When the controversy is thus brought in last analysis to this issue there would seem to be no room for any but an affirmative answer. Generically this must be unless it can be said that an agreement to direct the assembling and supervision of machinery whose intrinsic value largely depends upon its being united and made operative as a whole is not appropriate to its sale. The consequence of such a ruling if made in this case would be particularly emphasized by a consideration of the functions of the machinery composing the plant which was sold, of its complexity, of the necessity of its aggregation and unison with mechanical skill and precision in order that the result of the contract of sale—the ice plant purchased—might come into existence."

Similarly, in Vulcan Steam Shovel Co. v. Flanders (D.C.) 205 F. 102, 104, the court said: "Nor can the defendant fairly claim that the incidental work of moving this shovel from its location in Detroit to Orchard Lake, and its installation and test there, and the replacing of necessary parts, was carrying on business in this state. These acts were mere incidents of the contract of sale and part of the interstate commerce transaction."

The following language of the District Judge in the case of Aeolian Co. v. Fischer, 35 F.(2d) 34, was approved by the appellate court (C.C.A.2) 40 F.(2d) 189, 190, 191: "The agreement of the organ manufacturer to install is not only relevant and appropriate to the interstate sale but is essential if an organ, as distinguished from its parts, may be sold at all. The thing sold is a musical instrument, complete in itself. * * * Without descending to mechanical description it may be said that the work of installation is of the most vital importance in the construction of the completed organ, and requires in its performance not only the highest mechanical skill but a thorough understanding of the methods employed by the manufacturer in the arrangement of mechanical and electrical connections. * * * Whatever distinctions may be drawn in doubtful cases, it is clear that the instant case is governed and controlled by the decision in the ice ma-

chine case (York Mfg. Co. v. Colley, 247 U.S. 21, 38 S.Ct. 430, 62 L.Ed. 963, 11 A. L.R. 611). * * * The distinction there drawn between the setting up of lightning rods (Browning v. Waycross, 233 U.S. 16, 34 S.Ct. 578, 58 L.Ed. 828) and the installation of an ice machine shows that the contracts here in question for the construction and installation of organs clearly involve interstate commerce not only in the manufacture and shipment of the organ, but in its installation after arrival within the state." See, also, Lyons v. Federal System of Bakeries of America (C.C.A.7) 290 F. 793, 795; Bay City v. Frazier (C.C.A. 6) 77 F.(2d) 570, 573–574.

The appellant, however, contends that the contract is not one of sale, but is one "for the construction of public works." A similar argument was made in the case of Palmer v. Aeolian Co. (C.C.A.8) 46 F.(2d) 746, 750, certiorari denied 283 U.S. 851, 51 S.Ct. 560, 75 L.Ed. 1458, and was thus disposed of by the court:

"Appellant also claims that the contract should be subject to the Iowa statute, because the contract provided for the manufacture of the organ, and that manufacture is not commerce. The contract not only provided for the building of the organ but for its installation.

" 'Where the contract is for the sale of the article and for its delivery in another state, the transaction is one of interstate commerce, although the vendor may have also agreed to manufacture it in order to fulfill his contract of sale.' Addyston Pipe & Steel Co. v. United States, 175 U.S. 211, 20 S.Ct. 96, 109, 44 L.Ed. 136."

Furthermore, the contract itself, which is set out in full in the complaint, recites that the Hooven, Owens, Rentschler Company "proposes to *furnish the Purchaser*" certain described machinery, and that the machinery is to be "delivered and erected on foundations furnished by the *Purchaser*, at Imperial, California." (Italics our own.) "Brawley" was later substituted for "Imperial." The contract also refers to "any Sales Tax."

Examining the contract in its entirety, we are convinced that it is an agreement of purchase and sale on installments.

Assuming, however, for the sake of argument, that that portion of the contract which calls for construction work in the state of California is invalid, such invalidity does not affect the rest of the contract; for the part of the work to be done in California is easily separable from the rest of the project.

In Webster Mfg. Co. v. Byrnes, 207 Cal. 630, 640, 280 P. 101, 106, the court said: "Moreover, so long as any material portion of said note is valid and severable, any illegal portion thereof would not avail defendants in this action, as the note would be pro tanto valid, and the deed of trust to secure same would likewise be valid, and, of course, a regular sale thereunder would pass the title to the property. [Many cases cited.]" See, also, Jackson v. Shawl, 29 Cal. 267, 272; Haines v. Commercial Mortgage Co., 200 Cal. 609, 623, 254 P. 956, 255 P. 805, 53 A.L.R. 725; McQuillin on Municipal Corporations (2d Ed.) vol. 3, § 1352, pp. 940, 941.

Finally, it is to be observed that the foundation work and other California construction have already been substantially if not entirely completed by the district, so that to enjoin this part of the enterprise at this late date would be a futile proceeding.

The appellant also urges that the contract is invalid because it is in violation of the provision in the California Irrigation District Act requiring competitive bidding. Section 53 of that Act provides in part as follows: "Before the construction of any work to be paid for with the proceeds of the sale of bonds, or a special assessment levied in accordance with section 34 or section 59 of this act, the board of directors shall give notice, by publication thereof three times," etc.

From the foregoing, it will be seen that competitive bidding is required only for work that is to be paid for by means of a bond issue or by means of a special assessment. There are other funds, however, authorized by the Irrigation District Act; for section 67 of that statute reads as follows: "The following funds are hereby created and established, to which the moneys properly belonging shall be apportioned, to wit: bond principal fund, bond interest fund, construction fund, general fund." Nor are all assessments authorized by the act necessarily *special;* for, while sections 34 and 59, referred to in section 53, deal with special assessments, section 39 provides for "annual" assessments.

The contract itself does not recite from what funds payment is to be made, and there is no warrant for assuming that the statute will be violated. Indeed, under a familiar principle, it must be presumed

that the board of directors will observe the law.

It is true that the bill alleges that the appellant "is informed and believes and upon that ground alleges that all of said expenditures * * * will be paid for by a levy * * * of special assessments," etc. The bill also avers that, unless enjoined by the court, the appellees will cause all the lands within the district, including the appellant's lands, to be assessed for the purpose of paying for such expenditures. Elsewhere in the bill of complaint it is averred that the district is and will continue to be without funds to pay warrants. This later allegation was ordered stricken out by the court.

█ Despite these dire predictions, in this respect at least, it is clear that the appellant's suit is premature. Moreover, though the appellant contends that the act of 1919 is unconstitutional, we hold, as will more fully appear hereafter, that the act is valid. If, however, the act of 1919 were to be declared unconstitutional, then clearly the appellant still has failed to exhaust all his legal remedies under the Irrigation District Act.

Section 38 of the Irrigation District Act provides in part as follows:

"*Hearing.* Upon the day specified in the notice required by the preceding section for the meeting, the board of directors, which is hereby constituted a board of equalization for that purpose, shall meet and continue in session from time to time, as long as may be necessary, not to exceed ten days, exclusive of Sundays, to hear and determine such objections to the valuation, acreage, or any matter pertaining to the assessment as may come before them; and the board may make such changes thereof as may be just."

Prior to 1931, as the appellant itself points out, section 38 authorized the board of equalization merely to hear and determine "such objections to the valuation and assessment as may come before them"; and added, "and the board may change the valuation as may be just." St.Cal.1897, p. 267, § 38.

It will thus be seen that, by the amendment of 1931, the powers of the board as to changes affecting the assessment were greatly enlarged.

The board cannot levy a special assessment until authorized by the qualified electors of the district, according to sections 34 and 59. Until such election, an application for an injunction against such levy is clearly premature.

█ Section 34, referred to in section 53, which provides that bids shall be called for, makes it obligatory upon the directors to estimate the amount necessary and to call an election to determine whether or not there shall be a levy of special assessments, in cases where the money raised by the sale of bonds is insufficient to complete the plan of canal and works adopted.

Sections 30–33 contain elaborate provisions for the issuance of bonds by the board of directors. These provisions include rules regarding surveys, irrigation engineer's report special election, etc.

Under all these provisions for bond issues and special assessments, the appellant would be afforded ample opportunity by judicial proceeding or otherwise to resist any attempt made by the directors to raise money by means of special assessments or bonds to pay for construction work for which no bids had been asked.

In a word, the appellant's suit in this respect is premature, and under such circumstances a court of equity will deny relief. The appellant does not allege a single overt act by the directors looking to the issuance of bonds or the levy of special assessments, but, on the contrary, predictions on information and belief are the basis of the allegations. There are other ways in which the district can raise money, including tolls and charges for the sale of electricity. Tolls and charges are authorized both by section 55 of the Irrigation District Act and by section 1 of the Power Act.

The mere *possibility* that the directors may, in the future, attempt to raise money for the contract in question by means of special assessments, is too remote to warrant the issuance of an injunction. The bill discloses no such actual attempt, or imminent threat thereof. In the words of the Supreme Court in Arizona v. California, 283 U.S. 423, 462, 51 S.Ct. 522, 75 L. Ed. 1154, the bill merely alleges "assumed potential invasions" of the appellant's right to demand that competitive bids be had for a construction work to be paid for by bonds or special assessments.

█ In the absence of statutory provisions specifically so providing competitive bidding on public works is not required. Sections 1281 and 1288 of McQuillin on Municipal Corporations, supra, state the rule as follows:

"1281 (1179). *Mode of executing, form, and contents.* If the mode of contracting is not prescribed by statute or

charter, a municipality may make a contract in the same manner as other corporations or partnerships or individuals. * * *

"1288 (1186). *Same—necessity for competitive bids where not required by statute, charter or ordinance.* In the absence of charter or statutory requirement, municipal contracts need not be let under competitive bidding. So where a statute merely permits competitive bidding but does not require it, it is not necessary that the municipal authorities shall let the contract in that way. In such cases the corporate authorities are only required to act in good faith and to the best interest of the municipality."

The appellant's major assault upon the contract, however, is predicated upon the alleged unconstitutionality of the act of 1919, under the authority of which the contract was executed.

▆▆▆▆ As one of their defenses against that assault, the appellees rely upon the plea of res judicata. That plea is based upon a certain "validation" judgment entered by the superior court of Imperial county, Cal.

For a proper understanding of this plea of res judicata, a brief recital of the circumstances leading up to the validation judgment is necessary.

In order to obtain a more satisfactory water supply, the Imperial irrigation district helped to bring about the passage of the Boulder Canyon Project Act, 43 U.S.C.A. § 617 et seq. Among other things, in addition to the construction of Boulder Dam, that act provides for the construction of a dam on the Colorado river about 20 miles north of the international boundary line between California and Lower California, Mexico, and the construction of a canal on the west side of the Colorado river from that dam south to a point just north of the international boundary and thence west, all on United States soil, through Imperial county to the Imperial irrigation district and its canal system, the canal being about 60 miles long.

Thereafter a form of proposed contract between the Department of the Interior and the district was drawn up and submitted to the landowners and electors of the district at a special election. The vote was in favor of the contract, 4,939 to 729.

Among the terms and conditions of this "All-American Canal Contract," there was an authorization of the district to avail itself of the power possibilities along the canal and to apply "net proceeds from such power development * * * upon the next accruing installments due the Government on that Canal." Article 14 of the contract specifically provides that "the District shall have the privilege at any time of utilizing by contract or otherwise such power possibilities as may exist upon said canal."

In pursuance of article 31 of this All-American Canal Contract, an in rem validation proceeding was instituted against "All Persons" by the district, under the provisions of section 3 of Act 3873, Deering's General Laws of California 1931, p. 2041, in the superior court of Imperial county.

On July 1, 1933, the superior court entered a judgment declaring that "each and every article, clause, section and part" of the contract "is lawful and valid, and that the Board of Directors and officers of Imperial Irrigation District and the officers of the United States of America, who purported to have executed or caused said contract to be executed, were fully, duly, and lawfully authorized to enter into and execute said contract," etc., and "that each and every act, thing and proceeding necessary to be done, had, taken or performed to that end was done, had, taken or performed at and within the time provided by law and in the form and manner provided by law and by the proper officer or officers or person or persons, and that said contract was and is in all respects properly and lawfully executed and is, in all respects, the contract of Imperial Irrigation District and the United States of America and that Imperial Irrigation District and the United States of America are fully and lawfully authorized in all respects to comply with and fully and completely carry out the terms and provisions of said contract as provided and contained therein."

From the terms of the foregoing judgment, the appellees argue that the appellant "and its affiliated interests and the landowners and other possible parties litigant having failed to raise the question are forever barred to question the validity of the Act of 1919 in so far as it applies to the Imperial Irrigation District and enables the defendant District to develop and distribute electrical energy by virtue of the All American Canal Project and necessary standby plants."

An inspection of the judgment discloses that it contains no provision referring to

the act of 1919, which is now being attacked, or no specific statement that, under the law of California, the district can develop electric energy from the All-American Canal. Nor do the appellees contend that the validity of the act of 1919 was litigated in the validation suit. They merely argue that "the question of whether or not, so far as California law is concerned, the defendant District could and can develop and distribute hydro-electrical energy from the Canal, *could* have been litigated in the validation suit." (Italics our own.)

By the terms of the judgment, it is held that the district is authorized to *comply with and carry out* the "terms and provisions" of the contract. But it must be remembered that that district could have completely "complied with" and "carried out" all its obligations under the contract, without ever exercising the option or "privilege" of utilizing the power possibilities of the canal. The validity of the contract in no way depended upon the district's legal capacity to avail itself of the *privilege* therein accorded. The provision in question was merely permissive, and not mandatory.

It is well settled that "what effect a judgment of a state court shall have as res judicata is a question of state or local law." Union & Planters' Bank v. Memphis, 189 U.S. 71, 75, 23 S.Ct. 604, 606, 47 L.Ed. 712. See, also, Deposit Bank v. Frankfort, 191 U.S. 499, 517, 24 S.Ct. 154, 48 L.Ed. 276; City of Covington v. First Nat. Bank, 198 U.S. 100, 108, 109, 25 S.Ct. 562, 49 L.Ed. 963; Wright v. Georgia R. & Banking Co., 216 U.S. 420, 429, 30 S.Ct. 242, 54 L.Ed. 544.

We must therefore examine the decisions of the Supreme Court of California in order to determine the effect to be given to the validation judgment as res judicata in the instant case.

The appellees contend that "even in cases between private litigants it seems to be definitely settled in California that it is not necessary that the particular issue be pleaded or raised," and that "the only requirement seems to be that the issue in question could have been raised and determined in the first case."

We do not believe that this is an accurate statement of the California rule. While some loose language can be found in certain of the earlier decisions of the Supreme Court of the state, that tribunal, in a recent opinion, has expounded the correct doctrine with admirable precision.

In Todhunter v. Smith, 219 Cal. 690, 694, 28 P.(2d) 916, 918, which is cited by the appellees themselves, the court used the following language: "The doctrine of res judicata has a double aspect. A former judgment operates as a bar against a second action upon the same cause, but, in a later action upon a *different* claim or cause of action, it operates as an estoppel or conclusive adjudication as to such issues in the second action *as were actually litigated and determined in the first action*. (Italics our own.)" In re Estate of Bell, 153 Cal. 331, 340, 95 P. 372; Horton v. Goodenough, 184 Cal. 451, 461, 194 P. 34; Pomona College v. Dunn, 7 Cal.App.(2d) 227, 46 P.(2d) 270, 273, hearing denied by the Supreme Court of California, July 25, 1935; 15 Cal.Jur. § 189, pp. 136, 137; 7 Cal.Jur.Supp. § 189, p. 326.

The California rule accords with the view held by the United States Supreme Court.

In the leading case of Cromwell v. County of Sac, 94 U.S. 351, 352, 353, 24 L. Ed. 195, Mr. Justice Field said:

"In considering the operation of this judgment, it should be borne in mind, as stated by counsel, that there is a difference between the effect of a judgment as a bar or estoppel against the prosecution of a second action upon the same claim or demand, and its effect as an estoppel in another action between the same parties upon a different claim or cause of action. In the former case, the judgment, if rendered upon the merits, constitutes an absolute bar to a subsequent action. It is a finality as to the claim or demand in controversy, concluding parties and those in privity with them, not only as to every matter which was offered and received to sustain or defeat the claim or demand, but as to any other admissible matter which might have been offered for that purpose. Thus, for example, a judgment rendered upon a promissory note is conclusive as to the validity of the instrument and the amount due upon it, although it be subsequently alleged that perfect defences actually existed, of which no proof was offered, such as forgery, want of consideration, or payment. If such defences were not presented in the action, and established by competent evidence, the subsequent allegation of their existence is of no legal consequence. The judgment is as conclusive, so far as future proceedings at law are concerned, as though the defences never existed. The language, therefore, which is so often used,

that a judgment estops not only as to every ground of recovery or defence actually presented in the action, but also as to every ground which might have been presented, is strictly accurate, when applied to the demand or claim in controversy. Such demand or claim, having passed into judgment, cannot again be brought into litigation between the parties in proceedings at law upon any ground whatever.

"But where the second action between the same parties is upon a different claim or demand, the judgment in the prior action operates as an estoppel only as to those matters in issue or points controverted, upon the determination of which the finding or verdict was rendered. In all cases, therefore, where it is sought to apply the estoppel of a judgment rendered upon one cause of action to matters arising in a suit upon a different cause of action, the inquiry must always be as to the point or question actually litigated and determined in the original action, not what might have been thus litigated and determined. Only upon such matters is the judgment conclusive in another action.

"The difference in the operation of a judgment in the two classes of cases mentioned is seen through all the leading adjudications upon the doctrine of estoppel."

See, also, Tait v. Western Md. R. Co., 289 U.S. 620, 623, 53 S.Ct. 706, 77 L.Ed. 1405.

Applying the foregoing rules to the instant case, we find that, while the validation suit was filed expressly for the purpose of obtaining a judicial declaration upon the All-American Canal contract, the bill of complaint in the instant case, as the appellees themselves point out, "makes no reference to the All American Canal or the power possibilities of the District on that Canal."

Accordingly, the issue of res judicata as to the two actions must be determined according to the rule applicable to the second class of actions discussed by Mr. Justice Field. Adopting that rule, we here hold that the capacity of the district to engage in power development and the related question of the validity of the act of 1919 were neither litigated nor determined in the validation suit.

We therefore reject the appellees' plea of res judicata, and turn to a consideration, upon its merits, of the attack upon the constitutionality of the act of 1919.

The text of the statute follows in full:

"§ 1. *Irrigation District May Maintain Electric Power Plants.* Any irrigation district heretofore organized or hereafter to be organized under the laws relating to such district may provide for the construction, acquisition, operation, leasing and control of plants for the generation, distribution, sale and lease of electrical energy including sale to municipalities, corporations, public utility districts, or individuals, of electrical power so generated; and said district, subject, however, to the conditions in this section contained, may make special appropriations of water for power purposes, as required by law; provided, however, that any use of water for generating such electrical power or energy at any given time of the year, which use is in excess of the water appropriated and beneficially used for irrigation purposes by such district at said period of the year, shall be subject to all prior existing appropriations by any municipal corporation, who or which is proceeding in good faith in the expenditure of money and the construction of works designed to divert the water appropriated. The officers, agents and employees of such districts shall have the same powers, duties and liabilities respecting such power and the construction, acquisition, repair, maintenance, management and control thereof as they now have or may hereafter have respecting such irrigation or such irrigation districts. The California irrigation district act shall be so construed, applied and enforced as to apply to such power as well as such irrigation, except that nothing in said act shall be so construed as to prevent the sale of power by any district for use outside of the boundaries of such district or to require the distribution of such power in accordance with any assessments levied by such district.

"§ 2. *Management of Works.* The board of directors of any irrigation district and its officers, agents, and employees, shall do all necessary and proper acts for the construction, repair, maintenance, and management of such electrical power works for such purposes.

"§ 3. *Bonds.* In case funds are not otherwise available an irrigation district may issue bonds for such purpose and all of the provisions of the California irrigation district act, relating to the issuance of bonds for other purposes, and all other acts relative to bonds issued under the California irrigation district act, in so far as the

same are applicable to said bonds shall apply.

"§ 4. *Repealed.* All acts or parts of acts in conflict with any of the provisions of this act are hereby repealed." Gen.Laws Cal.1923, Act 3868, §§ 1–4.

In view of the fact that the act of 1919 adopts by reference the applicable provisions of the Irrigation District Act, it should be observed that, in 1915, the Legislature of California passed an act removing the limitation upon the maximum amount of the annual assessment which may be levied by an irrigation district if the area thereof is more than 500,000 acres. Except for section 4 of the act of 1915, the appellee district would be governed by the provisions of section 39 of the general Irrigation District Act, which fixes a limit of 2 per cent. of the aggregate value of the lands within the district, according to the duly equalized assessment roll thereof. The act of 1915 has been declared constitutional. Wores v. Imperial Irrigation District, 193 Cal. 609, 624, 227 P. 181.

In the first place, quite aside from the question of the constitutionality of the act of 1919, the appellant argues that, in the instant case, even the provisions of that act were not followed by the board of directors, in that "no election was ever held authorizing the board of directors to construct or provide for the construction of the Diesel engine generating plant." In that respect, the allegations of the bill are as follows:

"The question as to the making of any levy of special assessments for any of said purposes, or as to the issuance of bonds of said District for any of said purposes, has never been submitted to a vote of the electors of said District, or to the vote of the electors within any portion of said District, nor has any estimate of the amount required for such purposes ever been made by the Board of Directors of said District, nor has any notice been given or published calling for bids for the construction of such work or any portion thereof or for the furnishing of any materials to be furnished or used by the District in any such work. * * *

"* * * Nor has any special assessment been made or authorized by the electors of said District for any such purpose; that said project and purpose herein complained of is not and never was a part of or included in any construction plan of said District for which bonds were voted or funds provided in any manner. * * *"

The appellant argues that the "Act of 1919 prescribes in the very first sentence of the first section, that some steps be taken by the *district* itself before the provisions of the Act become operative," and that the language of the act is "permissive only."

We believe that the very language of the appellant's objection gives its case away as to this point. If the language of the act "makes it clear that the provisions * * * are permissive only," there is obviously no *mandatory* provision as to *how* the district "may," in the language of the act, "provide for the construction, acquisition," etc., of power plants.

Furthermore, section 2 of the act provides that: "The board of directors of any irrigation district and its officers, agents, and employees, shall do all necessary and proper acts for the construction, repair, maintenance, and management of such electrical power works for such purposes."

While, by the terms of the act of 1919, the California Irrigation District Act "shall be so construed, applied and enforced as to apply to such power as well as such irrigation" (section 1), the terms of the act of 1919 themselves, referred to above, indicate that the provisions for elections contained in the Irrigation District Act do not apply to the act of 1919, for the reason that, in the latter act, the Legislature itself has authorized the directors to proceed with the construction and management of power plants.

The essential difference between the Irrigation District Act and the Power Act of 1919 is more fully discussed in the section of this opinion immediately following, in connection with the requirements of notice and opportunity to be heard.

Conceding that "neither the validity nor the constitutionality of the Act of 1919 has ever been presented to, or decided by, any court," the appellant centers its attack upon that statute principally on the ground that it contains no provision affording to each landowner an opportunity to be heard on the question of including his land in the district.

More amply stated, the appellant's main contention is as follows: "The Act of 1919 is void and unconstitutional on its face, in that it attempts to authorize any irrigation district in the State to make a fundamental change in the purposes for which the district was organized, by converting itself in-

to a special assessment district for the generation, distribution and sale of light and power, without containing any provision affording to each of the landowners within the district any notice or opportunity to be heard on the question of whether his land is or will be benefited thereby, so as to justify the inclusion thereof within the boundaries of the district for such purposes. This violates the 'due process' clause of the Fourteenth Amendment to the United States Constitution."

In its complaint, the appellant alleges: "That neither the plaintiff [appellant] nor any other landowners within the district have ever been given any notice or opportunity to be heard upon the matter of whether plaintiff's said lands or the lands within said District will be benefited by the construction, acquisition, maintenance or operation of said Diesel engines," etc.

For the purpose of a motion to dismiss, the foregoing allegation must be taken to be true.

 At the outset, it should be observed that, although the appellant has not yet been given an opportunity to be heard, it may still have that opportunity *after a special assessment is actually levied,* if one is ever levied. We have already adverted at some length to the sweeping language of section 38 of the Irrigation District Act, which empowers the board of directors, acting as a board of equalization, "to hear and determine such objections to the valuation, *acreage, or any matter pertaining to the assessment* as may come before them."

The bill alleges, on information and belief, that special assessments will be made. It does not, however, allege that special assessments *have* been made against it, and that it has been denied a hearing as to "any matter" pertaining to it.

The general rule on this subject is that a hearing as to benefits must be provided "at some time before the land is finally burdened by the assessment." Palo Verde Irr. Dist. v. Seeley, 198 Cal. 477, 483, 245 P. 1092, 1096. In the instant case, the appellant's land has not been burdened with *any* assessment, final or otherwise. And it is elementary that it is presumed that the pleader has stated his case in a manner most favorable to himself.

Accordingly, our observations regarding the prematureness of the appellant's suit in connection with competitive bidding are likewise applicable here.

For the purposes of the discussion that follows, however, we will assume that, under the act of 1919, the appellant does not have the opportunity to be heard as to benefits, at any time before final assessment.

In support of its contention that the act of 1919 fails to afford landowners the right to be given notice and opportunity to be heard, and that it thereby violates the Fourteenth Amendment, the appellant relies heavily upon the leading case of Fallbrook Irrigation District v. Bradley, 164 U.S. 112, 17 S.Ct. 56, 41 L.Ed. 369.

 The appellant, however, freely concedes "that where the legislature itself organizes an improvement district and fixes the boundaries thereof, its determination that the lands included will be benefited by the improvement is conclusive *in the absence of a palpable abuse of discretion.*" (Italics the appellant's.) But the appellant adds that this exception to the general rule has no application where the Legislature itself has not organized or fixed the boundaries of the district. It is contended that the act of 1919 does not purport to fix such boundaries.

We cannot agree with the appellant in its restricted interpretation of the act of 1919. In order to fix the limits of a district, the Legislature need not resort to a recital of metes and bounds. It may use general terms, and adopt the boundaries of existing districts.

This recognized exception to the general rule requiring an opportunity for a hearing as to benefits is expounded in the case of In re Sutter-Butte By-Pass Assessment No. 6, 191 Cal. 650, 666, 218 P. 27, 33: "Nor is there any merit in the second objection for the reason that it is always competent for the Legislature to itself determine the lands to be benefited, either by describing the same, or *by laying down a rule which serves to identify them* and to determine the amount of the benefits accruing to those lands. Such determination is conclusive and not subject to review. This is upon the theory that the land owners themselves have had a hearing before the Legislature in arriving at such determination by and through their representatives in the Legislature. [Many cases cited.]" (Italics our own.) See, also, In re Orosi Public Utility Dist., 196 Cal. 43, at page 50, 235 P. 1004; Royer v. Public Utility Dist. No. 1 of Benton County (Wash.) 56 P.(2d) 1302, 1303, 1304.

In the act of 1919, the Legislature of California has laid down "a rule which serves to identify" the lands that are to be benefited by the establishment of power

plants; namely, all lands that are within irrigation districts.

 It is a well-established principle of constitutional law that, in the absence of a palpable abuse of discretion, the finding of the Legislature as to such matters will not be disturbed by the courts.

The latitude accorded by the courts to the Legislature in determining the wisdom, necessity, or desirability of an enactment was dwelt upon by Mr. Justice·Field in the case of Barbier v. Connolly, 113 U.S. 27, 31, 32, 5 S.Ct. 357, 359, 28 L.Ed. 923, with especial reference to the Fourteenth Amendment: "But neither the amendment —broad and comprehensive as it is—nor any other amendment, was designed to interfere with the power of the state, sometimes termed its police power, to prescribe regulations to promote the health, peace, morals, education, and good order of the people, and to legislate so as *to increase the industries of the state, develop its resources, and add to its wealth and prosperity.* From the very necessities of society, legislation of a special character, having these objects in view, must often be had *in certain districts,* such as for draining marshes and irrigating arid plains. Special burdens are often necessary for general benefits,—for supplying water, preventing fires, *lighting districts,* cleaning streets, opening parks, and *many other objects.* Regulations for these purposes may press with more or less weight upon one than upon another, but they are designed, not to impose unequal or unnecessary restrictions upon any one, *but to promote, with as little individual inconvenience as possible, the general good."* (Italics our own.)

 As the appellant points out, there are two essentials to the nature and character of an improvement, in order to provide a constitutional authorization for the levy of special assessments: First, the improvement must be for a public purpose, and not a private purpose; second, the nature of the improvement must be such as to confer a local and special benefit upon the property to be assessed therefor, over and above that received by the general public.

 In passing upon the constitutionality of state statutes, the federal courts accord great respect to the determination of the state Legislature and the state courts as to what constitutes a public use.

In Rindge Company v. Los Angeles County, 262 U.S. 700, 705, 706, 43 S.Ct. 689, 692, 67 L.Ed. 1186, the court said:

· "1. *Authorized Public Use.* The nature of a use, whether public or private, is ultimately a judicial question. However the determination of this question is influenced by local conditions; and this court, while enforcing the Fourteenth Amendment, should keep in view the diversity of such conditions, and regard with great respect the judgments of state courts upon what should be deemed public uses in any state. [Cases cited.] That a taking of property for a highway is a taking for public use has been universally recognized, from time immemorial. The California Code specifically declares 'highways' to be 'public uses' for which the right of eminent domain may be exercised. Here, the Board of Supervisors, familiar with local conditions, has declared these highways to be for public uses; and the local and appellate state courts have likewise held them to be for public uses authorized by law."

See, also, Fallbrook Irrigation District v. Bradley, supra, 164 U.S. 112, at page 160, 17 S.Ct. 56, 41 L.Ed. 369; Milheim v. Moffat Tunnel Dist., 262 U.S. 710, 717, 43 S.Ct. 694, 67 L.Ed. 1194.

 While "not, strictly speaking a municipal corporation," an irrigation district, according to the definition approved of in the most recent decisions of the Supreme Court of California, is a "public corporation for municipal purposes." Turlock Irr. District v. White, 186 Cal. 183, 187, 198 P. 1060, 1062, 17 A.L.R. 72, citing the Fallbrook Irrigation District Case, supra; Crawford v. Imperial Irrigation Dist., 200 Cal. 318, 325, 326, 253 P. 726, quoting with approval the Turlock Case, supra; Wood v. Imperial Irrigation District, 216 Cal. 748, 752, 753, 17 P.(2d) ·128, quoting with approval the Crawford Case, supra.

 The state Supreme Court has recognized that, in modern times, the conception of what are "municipal affairs" has been greatly broadened. In the case of In re Orosi Public Utility District, 196 Cal. 43, 57, 235 P. 1004, 1010, the court said: "Activities, once regarded as being of a strictly private nature, are now considered municipal affairs, e. g., the sale and distribution of electrical energy manufactured by a city, the supplying of water to its own inhabitants *or to outside territory,* the construction of a reservoir by a city on its own

land, and to be used for the benefit of its inhabitants, and the establishment and operation of transportation service." (Italics our own.)

If a city can sell water to outside territory without thereby engaging in an activity of a "private nature," it is hardly straining analogies to hold that an irrigation district likewise may sell power to persons outside its boundaries, without engaging in an activity of a "strictly private nature."

We advance next to the consideration of the second element necessary to sustain the levy of a special assessment; namely, that the nature of the improvement must be such as to confer a special and local benefit upon the property to be assessed, over and above that received by the general public.

Here again great latitude is allowed to the Legislature and to the assessing power.

In Milheim v. Moffat Tunnel Dist., supra, 262 U.S. 710, at page 721, 43 S.Ct. 694, 698, 67 L.Ed. 1194, the court stated:

"2. *Classification as to Special Benefits.* It is contended that no special benefits of a direct and immediate character will accrue from the tunnel to the lands lying within the District, as distinguished from the other lands in the State, and that hence the classification made by the Act in providing for the assessments solely upon the lands within the District, is entirely unreasonable and arbitrary. It is well settled, however, that if a proposed improvement is one which the State has authority to make and pay for by assessments on property benefited, the legislature in the exercise of the taxing power has authority to determine by the statute imposing the tax, what lands may be and are in fact benefited by the improvement; and if it does so, its determination is conclusive upon the owners and the courts and cannot be assailed under the Fourteenth Amendment unless it is wholly unwarranted and a flagrant abuse, and by reason of its arbitrary character is mere confiscation of the particular property. [Many cases cited.]"

Similar views have been expressed by the Supreme Court of California, particularly with respect to the doctrine that an indirect or incidental benefit is sufficient to justify the imposition of a part of the burden of the improvement.

In Los Angeles County F. C. Dist. v. Hamilton, 177 Cal. 119, 124–127, 169 P.

1028, 1030, the court dwelt upon this principle at some length:

"The mere passage of the act, then, must be taken to import a finding by the Legislature that the proposed work will answer a public purpose, and that its execution will benefit the land within the district to such an extent as to warrant the imposition upon such land of the cost in the manner provided. The findings thus implied are as fully effective as if declared in express terms in the act itself. [Case cited.] The fixing of the district which is to bear the expense of a local improvement, and the mode in which such expense is to be borne and distributed, are, primarily, legislative questions. [Cases cited.] Ordinarily the courts will feel themselves bound by the legislative body's determination of these questions. Indeed, there are not a few decisions containing expressions to the effect that the legislative determination that certain land will be benefited, and that the cost of the work should be assessed upon it according to a given plan, is conclusive. But since the imposition of such costs finds its ground of sanction in the benefits conferred upon the lands charged, it may well be that the legislative conclusion should not be upheld where the court can see that it is contrary to any rational view of the facts, and that lands have been included that 'plainly could not by any fair or proper view of the facts be benefited.' [Cases cited.] * * *

"To say, therefore, that any given parcel or tract of land is not directly subject to overflow is not to say that it cannot be benefited by the carrying out of the proposed plan. Even if the scope of the act were much narrower than it is, we should, under the decisions, be required to hold that the benefit which would justify the inclusion of land within the district need not be so direct and immediate as is assumed in the argument of counsel opposing the validity of the act. Thus, an incorporated city may be embraced within the boundaries of an irrigation district, although much of the land in the city does not require, and could not use, irrigation. [Cases cited.] Similarly, in other jurisdictions, it has been held that the inclusion in a drainage district of high lands not subject to inundation does not conclusively show a lack of benefit to such lands. [Cases cited.] An examination of these cases will show that the courts have regarded an incidental or indirect benefit as sufficient to justify

the imposition of a part of the burden of the improvement. Such indirect benefit may result from the improvement of neighboring and surrounding land, and the consequent increase in the value of all land within the district."

In Union Trust Co. v. Carnhope Irr. District, 132 Wash. 538, 541, 542, 232 P. 341, 342, 234 P. 277, the court used the following language: "It is to be borne in mind that this is not a charge upon the property owners for the actual water received, but merely for the expense connected with the creation and operation of the district. Volumes have been written upon the question of benefits, and a multiplicity of theories have been advanced by different courts and text-writers as to the basis upon which the benefits should be determined, *but the sound rule and the one which it would seem all the authorities are coming to is that these benefits are to be determined, as we have already indicated, by the increase of the market value of the property affected.* It may be that the increase in the market value may be coincident in certain cases with the value of the property, or according to its superficial area, or according to its frontage or any other measure, but these are mere coincidences, and do not furnish the proper basis for the assessment." (Italics our own.) See, also, Board of Directors v. Tregea, 88 Cal. 334, 352, 26 P. 237, writ of error dismissed 164 U.S. 179, 17 S.Ct. 52, 41 L.Ed. 395.

. We are aware that the bill of complaint in the instant case contains the following allegations:

"Plaintiff is informed and believes and upon that ground alleges that the special assessments which will be levied upon the said lands of plaintiff to meet said costs, expenses and charges will greatly exceed in amount the sum of $3,000 * * * and that said lands of the plaintiff have not received and will not receive any benefit from the construction, acquisition, maintenance or operation of said private commercial enterprise or from any of said expenditures or for any of the amounts assessed upon plaintiff's said lands for any of said purposes. * * *

"That the service and business thus contemplated by said alleged agreement is and will be of no benefit whatever to the plaintiff or to the said lands of the plaintiff or other agricultural lands in said District, but will be conducted at the expense of the

plaintiff and other land owners in said District, and plaintiff's said lands are and will be subject to assessment by said Board of Directors," etc.

 While, broadly speaking, it is true that, in considering a motion to dismiss, all well-pleaded allegations in the bill of complaint must be taken as true, there is an important exception to this general rule.

In the consideration of a pleading, the court will read it as if it contained a statement of all matters of which the court is required to take judicial notice, even when the pleading contains an express allegation to the contrary. Such an allegation is not admitted by demurrer, and may be treated as a nullity.

In Arizona v. California, 283 U.S. 423, 452, 51 S.Ct. 522, 525, 75 L.Ed. 1154, Mr. Justice Brandeis said: "The bill alleges that 'the river has never been, and is not now, a navigable river.' The argument is that the question whether a stream is navigable is one of fact; and that hence the motion to dismiss admits the allegation that the river is not navigable. It is true that whether a stream is navigable in law depends upon whether it is navigable in fact [case cited]; and that a motion to dismiss, like a demurrer, admits every well-pleaded allegation of fact [case cited]. But a court may take judicial notice that a river within its jurisdiction is navigable. [Cases cited.]"

This court has adopted the same view. In a case involving this same appellee district, Greeson v. Imperial Irr. Dist. (C.C. A.) 59 F.(2d) 529, 530, 531, 532, we said:

"The motion to dismiss admits as true all facts well pleaded. This was conceded by the trial court, but rightfully the trial court considered pertinent facts which it judicially knew, and on such consideration dismissed the bill of complaint. When a pleader states matter as fact which is out of harmony with facts which the court judicially knows, the averments in the pleading are disregarded. [Many cases cited.]

"Judicial knowledge is taken of all matters generally known. [Case cited.] * * * And if the judge's memory is at fault he may resort to means he may deem safe to refresh his memory. [Case cited.]"

See, also, French v. Senate, 146 Cal. 604, 607, 608, 80 P. 1031, 69 L.R.A. 556, 2 Ann.Cas. 756; Bell v. Southern Pacific Co., 189 Cal. 421, 425, 208 P. 970; 21 Cal.Jur. 21, 22.

So, in the instant case, we may well assume that the court below had judicial knowledge of the fact the appellant's lands would be benefited indirectly by the district's operation of power plants, through the increased market value of the appellant's lands. In the present instance, the lower court's judicial knowledge was fortified by the Legislature's implied finding of such indirect benefit, by "the mere passage of the act." Los Angeles County F. C. Dist. v. Hamilton, supra, 177 Cal. 119, at page 124, 169 P. 1028, 1030. Unless the lower court could "see that it is contrary to any rational view of the facts, and that lands have been included that 'plainly could not by any fair or proper view of the facts be benefited,'" the lower court was correct in upholding "the legislative conclusion." Id., 177 Cal. 119, at page 125, 169 P. 1028. And this court, too, can have judicial knowledge of the same facts.

"An appellate court can properly take judicial notice of any matter of which the court of original jurisdiction may properly take notice." Varcoe v. Lee, 180 Cal. 338, 343, 181 P. 223, 225.

Similarly, it is to be observed that the bill of complaint contains the following allegation: "That, notwithstanding the provisions of California Irrigation District Act that all meetings of said Board of Directors of said Imperial Irrigation District shall be public, each and all of said defendants * * * contriving to circumvent, defeat and avoid such requirement, intentionally and knowingly and with a design to keep the land owners and assessment payers of said District in ignorance of their intentions, did, at all said times prior to said April 4, 1934, discuss, arrange and negotiate said matter privately and wholly outside of any public meeting or meetings of said Board of Directors and secretly, covertly and collusively, did negotiate, conclude and reach a complete understanding and agreement among themselves to the effect that said District would purchase and pay for and pledge its credit for the purchase and payment for a Diesel engine power plant to be constructed and installed for the purpose of supplying electric energy to said City of Brawley and its inhabitants, and, possibly, also, as plaintiff is informed, to said City of Imperial and its inhabitants, but not elsewhere or to other persons in or to any other part of said District. That said matter being fully settled and agreed to secretly and covertly, as aforesaid, at some time prior to said April 4, 1934, and, a written form of proposal and agreement having been, prior to said date, prepared, the same was at a meeting of said Board of Directors of said District, on said date, formally, perfunctorily, hastily, and without debate or discussion, presented, accepted, ratified and adopted and its execution authorized by the unanimous vote of said Board of Directors, the defendants Hewes, Aten, Kalin, Rose and Young, each and all being present and voting in favor thereof. That, thereafter, each and all of said defendant Directors and also the defendant Goodson, wrongfully and in pursuance of said conspiracy and connivance, failed and refused to give out any copy of said purported contract, though repeatedly requested so to do by a landowner or landowners in said District and failed and refused to disclose the contents of such purported contract until after a certain petition for a writ of mandate was filed April 26, 1934, in the Superior Court of Imperial County by a landowner in said district to require delivery of a copy of said purported agreement."

In another paragraph of the bill, it is averred that certain of the appellees "each and all conspired and connived, secretly and covertly with each other and with said city of Brawley, and with various officials of said city, wrongfully and unlawfully, to divert, misuse and misappropriate the funds," etc., of the district, for the purpose of constructing the Diesel engine power plant.

Stripped of their conclusions of law, which are based upon the appellant's assumption that the act of 1919 is unconstitutional, these allegations amount simply to this: The directors secretly agreed among themselves to purchase a Diesel engine power plant, and then formally executed such a contract at a meeting—not alleged to have been secret—held on April 4, 1934. They refused to give out the contract until compelled to do so by order of court.

Nowhere in the bill is there an allegation that the directors were dishonest, or that they made any personal profit out of the contract with the Hooven, Owens, Rentschler Company. As for their secret discussions, it is a matter of common knowledge that members of deliberative bodies frequently, if not usually, discuss proposed measures with one another in private, before such measures are formally presented in open meeting.

Furthermore, the court below made a formal finding to the effect that "the Imperial Irrigation District, through its Board of Directors, has at all times herein mentioned openly and notoriously made known the continued intention that the Imperial Irrigation District would, as rapidly as possible, avail itself of the power possibilities upon said All American Canal." This is a statement of the court's judicial knowledge on the subject; for, if a fact is "openly and notoriously made known," it is to be presumed that it was known to the court. As the Supreme Court of California has said, "justice does not require that courts profess to be more ignorant than the rest of mankind." Varcoe v. Lee, supra, 180 Cal. 338, at page 345, 181 P. 223, 226.

We further hold that, under the act of 1919, the board of directors of the Imperial irrigation district was empowered to use the funds of the irrigation district for power purposes. Section 1 of that act specifically provides that the officers of the district "shall have the same powers * * * respecting such power and the construction, acquisition, repair, maintenance, management and control thereof as they now have or may hereafter have respecting such irrigation or such irrigation districts," and that "The California irrigation district act shall be so construed, applied and enforced as to apply to such power as well as such irrigation. * * *" Such sweeping grants of power would be vain and illusory if they did not carry with them the right to use irrigation district funds for power purposes.

Reverting to the question of the validity of the act of 1919, it should be borne in mind that there is a presumption, well established in the law, in favor of constitutionality.

In Los Angeles County F. C. Dist. v. Hamilton, supra, 177 Cal. 119, at page 125, 169 P. 1028, 1030, the court said: "It must, however, be remembered that, in inquiring whether a given act of the Legislature creating a local improvement district does thus transcend the limits of legislative power, we are governed by the rules applicable to any judicial examination of the validity of a statute. Not only must the court view the act in the light of every presumption and intendment favorable to its constitutionality, but it must limit itself to a consideration of such facts as appear upon the face of the enactment, together with such others as are matters of judicial cogni-

zance. Neither allegation nor proof of further facts can be considered. [Cases cited.]"

Were the appellant suing as a competitor of the district in the latter's power business, it might well argue that it was not being benefited by the appellees' Brawley project. But, through its president, the appellant stoutly denies that its only interest in the filing and prosecution of this action "is wholly and solely for the purpose of * * * assisting said The Southern Sierras Power Company in maintaining any monopoly upon the sale or distribution · of electrical energy within the above described areas". On the contrary, the appellant asserts that this action is brought "solely in the interest of the Imperial Irrigation District and for the purpose of restraining the illegal expenditures of the funds thereof," etc.

In the absence of a plain abuse of discretion, when confronted by the contrary implied finding of the Legislature that the sale and distribution of power *are* in the interest of irrigation districts, this court will not disturb such implied finding by declaring the statute unconstitutional.

In Williams v. Mayor, etc., of Baltimore, 289 U.S. 36, 42, 45, 53 S.Ct. 431, 433, 77 L.Ed. 1015, Mr. Justice Cardozo said: "The judicial· function is exhausted with the discovery that the relation between means and end is not wholly vain and fanciful, an illusory pretense. *Within the field where men of reason may reasonably differ, the Legislature must have its way.* [Case cited.] Nor in marking out that field will a court be forgetful of presumptions that help to fix the boundaries. 'As underlying questions of fact may condition the constitutionality of legislation of this character, the presumption of constitutionality must prevail in the absence of some factual foundation of record for overthrowing the statute.' [Case cited.] * * *

*"We may not nullify for doubt alone. There must be something near to certainty."* (Italics our own.)

Again, in Dominion Hotel v. Arizona, 249 U.S. 265, 268, 39 S.Ct. 273, 274, 63 L. Ed. 597, we find the same thought expressed by Mr. Justice Holmes: "The only question is whether we can say on our judicial knowledge that the Legislature of Arizona could not have had any reasonable ground for believing that there were such public considerations for the distinction

made by the present law. The deference due to the judgment of the Legislature on the matter has been emphasized again and again. [Case cited.] Of course, this is especially true when local conditions may affect the answer, *conditions that the Legislature does but that we cannot know.* [Italics our own.]"

Mr. Chief Justice Hughes, in Sproles v. Binford, 286 U.S. 374, 388, 389, 52 S.Ct. 581, 585, 76 L.Ed. 1167, thus summarized the doctrine: "To make scientific precision a criterion of constitutional power would be to subject the state to an intolerable supervision hostile to the basic principles of our government and wholly beyond the protection which the general clause of the Fourteenth Amendment was intended to secure. [Case cited.] When the subject lies within the police power of the state, debatable questions as to reasonableness are not for the courts but for the Legislature, which is entitled to form its own judgment, and its action within its range of discretion cannot be set aside because compliance is burdensome."

In this circuit, the wholesome disinclination of federal courts to declare state statutes unconstitutional, except for compelling reasons, was well expressed, and with a wealth of citations, by the late Judge Sawtelle, of this court, in San Francisco Shopping News Co. v. City of South San Francisco, 69 F.(2d) 879, 892, certiorari denied 293 U.S. 606, 55 S.Ct. 122, 79 L.Ed. 697: "In conclusion, we desire to advert to the salutary reluctance displayed by the courts—especially, as we have seen, by the federal courts—with regard to declaring unconstitutional an enactment of the lawmaking body of a state or of any of its agencies or subdivisions. That reluctance we share."

Decree affirmed.